**Sherry D. PARKER, Admrx. of the Est. of John E. Parker, Sr.**

**v.**

**Gerhard HOHMAN.**

**Madonna A. ROSSI, Admrx. of the Estate of Philip J. Rossi, Sr.**

**v.**

**Gerhard HOHMAN.**

**Mattie B. MacLEAN, Admrx. of the Est. of Perley MacLean**

**v.**

**Gerhard HOHMAN.**

Supreme Judicial Court of Maine.

March 3, 1969.

Basil A. Latty, Portland, Eldred H. Johnson, Cherryfield, for appellants.

Herbert T. Silsby, II, and Frank Walker, Ellsworth, for appellee.

Before WILLIAMSON, C. J., and WEBBER, TAPLEY, MARDEN, DUFRESNE, and WEATHERBEE, JJ.

WEATHERBEE, Justice.

On appeal.

Shortly before 7:00 A.M. on March 25, 1964, Philip J. Rossi, Sr. was driving his automobile in a westerly direction toward Ellsworth on U. S. Route No. 1. He and his two passengers, Perley MacLean and John E. Parker, Sr., were on their way to work in Ellsworth. At this same time, the defendant, Gerhard Hohman, who had just been awakened from a nap in his car after an extended evening of social activity that had lasted until at least 4:30 A.M., started to drive East on Route 1. Defendant had proceeded only three or four miles when his car was in a head-on collision with that of Rossi. Rossi and his two passengers were instantly killed.

These actions were brought by the personal representatives of the three deceased men and the three cases were tried together in October of 1966. The jury returned verdicts for the three plaintiffs. The defendant filed motions for judgments n. o. v. and, alternatively, for new trials, which the Presiding Justice denied. Field and McKusick, Maine Civil Practice, Section 50.4. Defendant appealed from the judgments and assigned several claimed errors on the part of the Presiding Justice one of which, involving the admission of certain opinion evidence by an expert witness, proves determinative of part of our problem.

Defendant also assigned as error the Presiding Justice's instruction to the jury that the plaintiffs' intestates were presumed to have been in the exercise of due care and that the defendant, relying on contributory negligence, had the duty of alleging and proving it.

When the Death-Liability Act of 1891 (P.L.1891, Chap. 124) created a remedy for wrongful death it made no change in the common law principle that the plaintiff has the burden of proof of freedom from contributory negligence. Danforth v. Emmons, 124 Me. 156, 126 A. 821 (1924). In 1913 our Legislature enacted P.L.1913, Chap. 27 which reversed this common law rule in death actions. It became Chap. 113, Sec. 50 of the Revised Statutes of 1954, which reads:

> "Sec. 50. Burden of proof on defendant in certain cases of negligence; contributory negligence pleaded.—In actions to recover damages for negligently causing the death of a person or for injury to a person who is deceased at the time of trial of such action, the person for whose death or injury the action is brought *shall be presumed to have been in the exercise of due care at the time of all acts in any way related to his death or injury, and if contributory negligence be relied upon as a defense, it shall be pleaded and proved by the defendant.* (R.S. c. 100, § 50)" (Emphasis added)

This statute remained in effect until 1959. Its directions were held by our Court not to have changed the substantive common law rule that contributory negligence of the deceased will defeat the claim of his personal representative but to have shifted to the defendant the burden of proof that there *was* contributory negligence. Field v. Webber, 132 Me. 236, 169 A. 732 (1933). The more recent evolution of our understanding of the effect of presumptions (Hinds v. John Hancock Mutual Life Ins. Co., 155 Me. 349, 155 A.2d 721, 85 A.L.R.2d 703 (1959) ) enables us to recognize that the operation of the two principles—a plaintiff's presumption of due care and a defendant's burden of proof of contributory negligence—leads to differing results. We consider the use of the two terms by the Legislature here not as an attempt to create a pure presumption of law (such as we described in Hinds) in addition to establishing defendant's burden of proof as to contributory negligence but as an effort to emphasize its intention that no part of that burden of proof concerning contributory negligence should remain with the plaintiff. (We are aware of the passage by a later Legislature of P.L.1967, Chap. 494, Section 15–A which restored to the statute the repealed provisions of Chap. 113, Section 50).

On June 1, 1959, the Maine Rules of Civil Procedure were promulgated by the Supreme Judicial Court, to become effective on December 1, 1959. The Court derived its authority from its inherent common law power (Fox v. Conway Fire Insurance Co., 53 Me. 107 (1865)) and from specific legislative authorization. P.L.1957, Chap. 159, which, with amendments, became 4 M.R.S.A., Section 8, gave the Court full rule making power.

> "The Supreme Judicial Court shall have the power to prescribe, by general rules, for the District and Superior Courts of Maine, the forms of process, writs, pleadings and motions, and the practice and procedure in civil actions at law. Said rules shall neither abridge, enlarge nor modify the substantive rights of any litigant. They shall take effect on such date not less than 6 months after their promulgation as the Supreme Judicial Court may fix. After their promulgation the Supreme Judicial Court may repeal, amend, modify or add to them from time to time with or without a waiting period. After the effective date of said rules as promulgated or amended, all laws in conflict therewith shall be of no further force or effect."

The final drafting of the Rules was preceded by nearly two years of intense and

well publicized efforts on the part of an Advisory Committee on Rules the results of which were reported on several occasions to the bench and bar and a draft of which was presented to the Judiciary Committee of the Legislature in connection with their expected study of supplementary legislation. The consultant to the Advisory Committee with the help of the Director of Legislative Research prepared legislation to accomplish changes in our statutes necessary or appropriate because of the imminence of the promulgation of the Rules. The Court joined the Committee in recommending to the Legislature the repeal of Section 50 as one of many sections to be superseded by the Rules. Field and McKusick, Maine Civil Practice, foreword by Chief Justice Robert B. Williamson, Section 8.7. This legislation was enacted by the Legislature as P.L.1959, Chap. 317. It includes, as part of Section 176, the repeal of Section 50. The effective date of the repeal was fixed as December 1, 1959, which was also the effective date of the proposed new Rules.

Thus we may infer that the Legislature was informed as to the language of the proposed Rule 8(c) when it repealed Section 50 and we know that the Court was aware of the Legislature's action in repealing the statute at the time it promulgated the Rule. Each timed the effective date of its action to coincide with the effective date of the other's action.

Section (c) of Rule 8 reads in part:

"In pleading to a preceding pleading, a party shall *set forth affirmatively* accord and satisfaction, arbitration and award, assumption of risk, *contributory negligence in actions for negligently causing death or for injury to a person who is deceased at the time of trial,* discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense." (Emphasis added.)

The promulgation of Rule 8(c) as it applies to actions for wrongful death or for injury to a person who is deceased at the time of trial did not change the substantive rights of the defendant. On the date the Rule was adopted the statute requiring a defendant who relies on contributory negligence of the deceased to both allege and prove it was still in effect. The circumstances of the adoption of Rule 8(c) and the repeal of the statute argue convincingly that the Court intended the burden of proof of contributory negligence to remain with the defendant where the statute had placed it and that the Legislature considered that the statute would be superfluous after the effective date of the Rule. We interpret the Rule to require the defendant in an action for negligently causing death or for injury to a person who is deceased at the time of trial to prove as well as allege contributory negligence.

■ Two brothers from Steuben, who worked with the three deceased men in Ellsworth, testified that they were preparing to leave home for Ellsworth when the Rossi car passed them "a couple of minutes" ahead of the brothers. The two brothers drove at a rate of 45–50 miles per hour and got glimpses of the Rossi car a considerable distance ahead of them two or three times in the course of their travel toward Ellsworth. They last saw the Rossi car "a couple of minutes" before they arrived at the scene of the accident. Over objection they were permitted to estimate the speed of the Rossi car at 45 to 50.

In Emery v. Frateschi, 161 Me. 281, 211 A.2d 578 (1965) we upheld the Presiding Justice in excluding as of unreliable probative value as to the speed of a vehicle at the point of impact an estimate by a witness that the vehicle was traveling 75 to 80 when it passed him two and one-half to three miles from the scene. We believe that here the contingencies of change were too great to permit attempted proof of the speed of

the vehicle as it approached Ellsworth by estimates of its two or three previously observed speeds, the last of which "2 miles or better" from the fatal scene. The contingency that the Rossi car's speed was not constant during this period must exclude this testimony as unreliable proof of its velocity at the point of collision.

There were no eyewitnesses to the collision except the defendant whose testimony was barred, because of the death of Rossi and his companions. 16 M.R.S.A., Section 1; Tobey v. Quick, 149 Me. 306, 101 A.2d 187 (1953). Two police officers described the scene as it appeared only moments after the impact and produced measurements of the positions of the two vehicles and numerous photographs of the cars and of the area of the collision. Plaintiff's proof rested largely in the testimony of an engineer who attempted a reconstruction of the crash and, over the defendant's objection, was permitted to express what was in fact an opinion as to the cause of the collision.

■■ The appropriateness of admitting opinion testimony from a qualified expert as to matters within his field which are beyond the experience and training to be expected from members of the jury is too well established to require citation of authority. The qualification of the expert and the range of his opinion testimony are matters within the judicial discretion of the Presiding Justice. State v. Wardwell, 158 Me. 307, 183 A.2d 896 (1962); Grant v. Dolley, 131 Me. 500, 163 A. 85 (1932); 31 Am.Jur.2d, Expert and Opinion Evidence, Section 26. The opinion of the expert, however, must be based upon facts established by the evidence in the case to which sound scientific principles are applied. Warren v. Waterville Urban Renewal Authority, Me., 235 A.2d 295 (1967).

■ In recent years, the propriety of permitting the reconstruction of automobile accidents by qualified experts from physical evidence existing following the crash has been recognized by a number of jurisdic-tions. Gray v. Woods, 84 Ariz. 87, 324 P.2d 220 (1958); Nielsen v. Wessels, 247 Iowa 213, 73 N.W.2d 83 (1955); Hazelrigg Trucking Co. v. Duvall, Okl., 261 P.2d 204 (1953). We accept the general principle that this may be done, so long as the opinion of the expert results from the application of scientific principles and physical laws to adequate facts which are in evidence. The expert's opinion may not be based upon surmise or conjecture.

■ Prior to the introduction of the controversial testimony of the expert witness, the jury could have found as follows: The morning was misty with light patches of fog and the pavement was wet. Visibility was adequate. The road was a paved highway divided at the scene by a white center line into two 12' 8" lanes. It curved slightly to the right in the direction defendant was traveling. Defendant drove a Ford station wagon. He had consumed four drinks of whiskey and three beers before midnight and had sat in his car with a young woman until 4:30 A.M. or later. She said he was not intoxicated at the time they separated. A friend had found him alone asleep in the car a few minutes before the accident.

As defendant approached the scene, the south lane would have been his right-hand lane, while the north lane would have been appropriate for use by the Rossi Corvair.

After the collision the Corvair came to rest crossways on the south lane with its rear end over the south guardrail. The Ford was a few feet beyond it to the east. The Ford had approximately reversed directions and was headed back toward Ellsworth in the south lane somewhat parallel with the center line but with its right rear corner extending over the center line into the northerly lane approximately a foot. The front ends of both were demolished except for each left headlight and fender. Debris, consisting of dirt, mud, a few nuts and bolts and pieces of material from the two cars lay in the highway under the vehicles and extending a few yards west to-

ward Ellsworth. It was scattered over the entire width of the south lane and some of it was found three or four feet into the north lane. There were no tire marks. A small scratch mark, of no significance, had been scraped into the highway immediately in front of the rest position of the Ford.

The expert had had extensive training and experience in all the physical sciences and, within the limits we will discuss, was well qualified to interpret the results of the impact upon the two vehicles. He attempted a reconstruction of the accident based upon his visit to the scene, an inspection of the unchanged wrecks of the cars some two years later, their vital statistics, a study of several photographs of the cars and the highway taken at the scene immediately after the collision, the measurements of the area and of the positions of the cars at rest, a diagram of the scene prepared by police to which they had testified and his information as to existing weather conditions.

The procedure of the expert was to commence with the rest positions of the two cars and, working backwards, to determine their points of disengagement, of total engagement and of initial contact. This necessitated locating the courses followed by the cars after impact.

The witness was able to determine from the damage to the vehicles that the right front of one collided with the right front of the other. He testified that the deformation of the wrecks enable him to find the angle of the cars at impact to within about eight degrees. We understand that he believes that they met approximately head on. He then attempted to work back from their rest positions to establish their relative positions on the highway just before impact—including the determination of whether they were parallel to the center line or at an angle to it.

The back-tracking of the rotating course of the vehicles from their rest positions to the point of impact (in the absence of marks on the highway) involved a sequence of deductions in which the determination of kinetic energy and the combined mass of the two vehicles played necessary parts. We conclude that these conclusions were based upon assumptions as to several essential factors which, considered with the 8° uncertainty of angle at impact, render the ultimate deduction unreliable and objectionable.

Essential in the witness' reconstruction is the kinetic energy of the vehicles—the energy that each car had while in motion before the impact. A necessary factor in determining kinetic energy is the speed of the vehicle. Having no valid testimony as to speed, the witness assumed the speed to each car to have been at approximately fifty miles per hour, for the reason that he believes that in reasonably clear weather people tend to drive at approximately the legal speed limit which he also assumed to have been fifty miles per hour at the point in question. The witness checked the assumed speed against calculations involving the center of balance of the vehicles. The center of balance is also important in determining the area and course of rotation of the vehicle after impact. However, several factors essential as to this conclusion were not available to the witness. The weights of Rossi and his two passengers, their positions in the Corvair, the amounts of gasoline in the tanks of the two cars and the possible presence in either car of articles of appreciable weight would appear to be elements which might well effect the delicate calculations of the witness. The witness finds the factor of degree of friction of tires upon road surface also important in determining the extent and course of rotation of the vehicles after collision and used it in his calculations but agreed that it is likely that one or both cars was airborne during rotation (in view of the absence of tire marks), in which case there would have been no highway friction. (We also note that plaintiffs' Exhibit 14, the witness' sketch of the scene from which the witness worked, shows the rest position

of the Ford to be about a foot farther south of the center line than the photographs and the officers' testimony placed it). On the basis of these calculations the witness expressed his opinion that at the point of impact the Corvair was entirely in the south lane, angled slightly toward the center line and that the Ford was in the south lane, angled slightly away from the center line except that its left rear wheel was across the center line into the north lane a distance of two feet. He further concluded and testified over objection that the Ford was in the process of turning from the north lane into the south lane at the point of impact.

The absence of tire marks on the highway makes formidable any attempt to trace the course of the vehicles before the impact. The possibility of error of 8° in the angle of the cars toward each other at contact, which he frankly admits, could alone have important effect upon the location of defendant's car at time of contact. It also appears to us that a very slight variation in the angle of both cars toward the center line (as distinguished from the angle of each toward the other) would significantly affect the witness' ultimate conclusion. We believe that the witness' conclusion that the left rear corner of defendant's car was in the north lane resulting from his backtracking from the rest positions was based upon too many assumed factors to justify a jury's reliance. His explanation that the Ford driven by defendant was in the process of going from the north lane to the south lane was pure conjecture, and prejudicial because it suggests that the defendant had been driving in the north, wrong, lane and was attempting to get back into his own lane. We find no scientific basis for this last explanation.

The introduction of these two answers was error and entitles defendant to a new trial.

■ Defendant, however, also moved for judgments n. o. v. In reviewing the Justice's denial of these motions we view the evidence in the light most favorable to the plaintiffs. Jordan v. Portland Coach Co., 150 Me. 149, 107 A.2d 416 (1954); Field and McKusick, Maine Civil Practice, supra, Section 50.4.

■ The plaintiffs had the burden of establishing negligence by the defendant which was a proximate cause of the collision. Viewing the meager evidence in the light most favorable to the plaintiffs, was there evidence exclusive of the expert's two objectionable statements of opinion which would support a jury's finding of negligence on the defendant's part? It appears to us that there was. The defendant told one of the investigating officers that he had not seen the Rossi car before the collision. The law places upon every driver a duty to exercise such a degree of vigilance that he will see seasonably that which is open and apparent. Spang v. Cote, 144 Me. 338, 66 A.2d 823 (1949). There was uncontroverted evidence that the defendant had adequate visibility of some several hundred yards as he approached the point of impact. No condition of the terrain concealed the other car from his view. His failure to see the approaching Rossi car would be negligence at law. However, this negligence would support verdicts for the plaintiffs only if it was a proximate cause of the collision. Specifically, this negligence of the defendant could be considered a proximate cause of the accident only if the evidence showed that if he *had* seen the other car coming toward him there was a course of action which he could have taken which would have enabled him to have avoided the collision. Dumas v. Labonte, Me., 218 A.2d 369 (1966); Tinker v. Trevett, 155 Me. 426, 156 A.2d 233 (1959).

While the physical evidence of the debris which was spread across the south lane of the highway could properly suggest to the jury that the collision took place in the defendant's lane, we can only speculate on the courses of the cars as they approached the area of the collision. We do not know

whether one or both cars reached the position occupied at impact as a result of sudden change from one lane to the other. Although the jury could have found that the Corvair had entered defendant's lane before impact and that defendant should have seen it there we have no way of knowing whether it had swerved into defendant's lane so suddenly that even if defendant had seen it he would have been unable to avoid collision. There were no facts from which the jury could have inferred that defendant, even if attentive, could have avoided the accident. Manchester v. Dugan, Me., 247 A.2d 827 (1968). While testimony as to defendant's nocturnal activities may have invited conjecture that his driving was likely to have caused the accident the jury's verdict must not be based on such conjecture. If, in fact, the defendant could have escaped the collision if he had been paying due attention, the plaintiffs have been unable to prove it by a fair preponderance of the evidence.

Therefore, the status of proof of due care on the part of Rossi and his two passengers, respectively, in the light of Rule 8(c) and the requirement of 29 M.R.S.A. Sec. 941 that drivers must bear seasonably to the right when approaching to meet other vehicles (Nadeau v. Perkins, 135 Me. 215, 193 A. 877 (1937)) is not reached.

It appears to us that a new trial rather than a final termination of the trial stage of the controversy would better serve the ends of justice. M.R.C.P. Rule 50(c).

Therefore, defendant's motions for judgment for defendant n. o. v. in each case are denied. Defendant's motions for new trial in each case are granted.