STATE of Maine

v.

Robert IFILL.

Supreme Judicial Court of Maine.

Dec. 17, 1975.

Joseph M. Jabar, Dist. Atty., Charles K. Leadbetter, Asst. Atty. Gen., Augusta, for plaintiff.

Farris & Foley by Gregory J. Farris, Gardiner, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD, and DELAHANTY, JJ.

ARCHIBALD, Justice.

Robert Ifill was indicted by a Kennebec County Grand Jury on three counts[1] alleging a violation of the provisions of 29 M. R.S.A. § 1315 (recklessly causing death). A traverse jury returned guilty verdicts on each count. Judgments were entered accordingly from which Robert Ifill has appealed. We deny the appeals.

Appellant has asserted numerous reasons for reversing these convictions, some of which require more than cursory examination. We will deal with these issues independently but not necessarily in the same order in which they were argued.

---

1. Instantly killed in this accident were Edward Rice, Irenee Dion and Wallace Bruce.

On March 3, 1974, at approximately 1:40 a. m., an automobile in which the three decedents and the appellant were riding was involved in an accident in the town of Chelsea. The State sought to prove that the appellant was the operator of this vehicle, and further, that his operation thereof was with reckless disregard for the lives of his three passengers since he not only was operating the vehicle while under the influence of intoxicating liquor but was doing so at a dangerous rate of speed considering the hazardous highway conditions on the day in question, which factors combined to cause him to lose control of the vehicle so that it left the highway and crashed directly into a dwelling house. Robert Ifill testified he was not the driver of the vehicle at that time and that the operator was one of the decedents, Edward Rice.

I

The first issue which requires our consideration is appellant's contention that error was committed in denying his motion for a change of venue.[2]

Appellant sought to prove that pre-trial publicity in Kennebec County by the news media had created such a prejudicial atmosphere that a constitutionally fair trial could not be obtained in that county.

Certain basic concepts must govern our consideration of the appellant's position. Although under ordinary circumstances the decision of a presiding justice on a motion for change of venue is final absent an abuse of discretion,[3] which the movant must demonstrate,[4] there may be circumstances when the nature and quality of pre-trial publicity, per se, mandate a change in venue since, otherwise, the re-

quirements of the Fourteenth Amendment of the Constitution of the United States would be violated. *State v. Coty*, 229 A.2d 205.

From several decisions of the United States Supreme Court we glean that Fourteenth Amendment violations may flow from facts demonstrating both intensive and extensive pre-trial publicity of an invidious nature tending to arouse general ill will and vindictiveness against the accused. *See Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). It is our obligation to examine both the quantity and the quality of the pre-trial publicity which is made a part of the record on appeal in order to determine whether the appellant has demonstrated such a violation. *Beck v. Washington*, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed. 2d 98 (1962).

The record contains four newspaper articles appearing in the Kennebec Journal and the Waterville Morning Sentinal, both newspapers of general circulation in Kennebec County. Two of these articles appeared on March 4, 1974, which was the day following the fatal accident. A third article appeared in the Kennebec Journal on May 22, 1974, and the same newspaper contained another article on July 10, 1974.

The indictment in this case was returned July 8, 1974, and hearing on the motion for change of venue was held on September 20, 1974. In one of these articles (in which there were photographs of the accident scene) Ifill was identified as the driver of the vehicle, and in the article of July 10, 1974, it was headlined "Ifill is indicted in crash deaths."

2. "The court upon motion of the defendant shall transfer the proceeding as to him to another county if the court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county." Rule 21(a), M.R.Crim.P.

3. *State v. Northup*, 318 A.2d 489 (Me.1974); *State v. Stoddard*, 289 A.2d 33 (Me.1972); *State v. Coty*, 229 A.2d 205 (Me.1967).

4. *State v. Beckus*, 229 A.2d 316 (Me.1967), *cert. denied*, 389 U.S. 870, 88 S.Ct. 149, 19 L.Ed.2d 148.

In addition to the four newspaper reports appellant introduced two witnesses, the Kennebec County Sheriff and the Augusta Police Chief, both of whom agreed that there was some general knowledge of the appellant in the community and of the fact that the criminal charge against him was pending. Ifill himself testified that his children had repeated neighborhood gossip derived from other children, connecting him with this fatal crash.

Testing these facts against precedent leaves no doubt that appellant has not demonstrated any error in the ruling on the motion for change of venue. The Justice below could properly draw the inference (as we do) that the publicity was neither intensive nor extensive and was not so potentially prejudicial as to deprive Ifill of the opportunity to obtain a fair trial in Kennebec County. The facts so carefully detailed in *State v. Coty, supra,* were not deemed sufficient to demonstrate such a manifest build-up of prejudice that a refusal to change venue violated the Fourteenth Amendment. By comparison with the facts in *Coty* those before us become relatively insignificant judged in terms of constitutional standards. We find that appellant's Fourteenth Amendment rights have not been violated.

Although the motion for change of venue was not renewed prior to trial on December 2, 1974, we have examined the record of the voir dire examination conducted at the time the jury was impaneled, our purpose being to determine whether that record demonstrated *actual prejudice* on the part of the venire then assembled.

We have in mind the rule announced in *State v. Pritchett,* 302 A.2d 101, 104 (Me. 1973):

"The true objective is to ascertain whether the potential jurors have acquired a bias or prejudice against the defendant or a fixed and settled impression as to his guilt or innocence. The effect, if any, of local gossip can best be ascer-

tained by the examination of persons called for jury duty prior to their selection to try the defendant. . . ."

The venire consisted of fifty prospective jurors. Eleven jurors had no knowledge of any kind bearing upon any facet of the case or of the lawyers or witnesses involved. The other thirty-nine jurors were questioned individually with ample opportunity being given for examination by appellant's counsel. Of them nineteen were excused for cause, some of the reasons being either a connection in some respect to attorneys or witnesses in the trial or a knowledge of or acquaintance with one of the deceased. Two were excused for the simple reason that they did not drive a motor vehicle. The record does not disclose the number of challenges exercised by either the State or the appellant, but it does disclose the following which ensued after the necessary jurors had been excused for cause and after a complete voir dire of the remaining panel:

"THE COURT: The clerk may now proceed to impanel a jury of twelve, together with two alternates by calling their names ad seriatum [sic].

(The jury panel was called in the usual manner with both Counsel exercising their peremptory challenges at Side Bar.)

THE COURT: Does the Court understand from Counsel that this panel of twelve jurors and two alternates is satisfactory to the State?

MR. MARDEN: It is, your Honor.

THE COURT: To the Defendant?

MR. FARRIS: It is, your Honor.

THE COURT: They may be sworn. (The jury was sworn by the Clerk of Court.)"

We conclude that the record fails to show any actual prejudice on the part of any of the jurors selected and it thus follows that there was no obvious error or

defect in the actual jury selection process which affected any of appellant's rights. Rule 52(b), M.R.Crim.P.

## II

On December 1, 1974 (the day preceding the trial), defense counsel learned from the prosecutor that the State intended to call an additional witness, one Madeline Lerette, who had not been previously listed as a witness. Appellant promptly filed a motion for continuance claiming surprise and that time was needed to investigate the "integrity, credibility and general liability" of this witness. This motion was denied.

■■ The denial of a motion for continuance is discretionary with the presiding justice. *State v. Curtis*, 295 A.2d 252 (Me. 1972). If Mr. Ifill is to prevail, he must not only demonstrate that the denial of the motion was an abuse of discretion, but he must also demonstrate prejudice because the ruling was "palpable error" or resulted in an "apparent injustice." *State v. Simmonds*, 313 A.2d 120 (Me. 1973); *State v. Rastrom*, 261 A.2d 245 (Me. 1970).

■ We acknowledge that the testimony of this witness became relevant and beneficial to the State in its endeavor to prove that Ifill was the operator of the vehicle at the time of the fatal accident. Miss Lerette testified *in rebuttal* that approximately ten minutes before the accident she had seen Mr. Ifill enter the vehicle in the driver's seat and drive the car from a filling station yard. Although other persons had testified that Mr. Ifill had driven the vehicle at an earlier time, she was the last one to see him do so prior to the accident.

The trial began on December 2, 1974. Madeline Lerette did not testify in the presentation of the State's direct evidence. On December 9, the State having rested, Ifill testified in his own defense, contending that the driver of the vehicle was Eddie Rice and that he was a passenger in the back seat at the time of the accident.

The defense having rested, the State called Madeline Lerette who testified that she had been driven to the vicinity of her home by Ifill, Edward Rice being a passenger in the vehicle at that time. After she had gotten out of the vehicle she observed it drive into a Sunoco filling station. She then "went and hid in the bushes" so that she could observe what was happening in the yard. She testified that she saw four individuals around the Ifill car and that finally "Bobby [Ifill] got back into the driver's seat, Eddie [Rice] was into the passenger seat and the two other guys got into the back," and "then, they pulled out and went up towards the State Police Barracks."

The record is devoid of any evidence that Ifill was prejudiced by the denial of the motion for continuance. We know of no rule which mandates the listing of possible rebuttal witnesses. Furthermore, at least seven days elapsed after notification was given that the witness might be called and her actual appearance. We note that in this seven day period the Court recessed on December 7 and 8 for the week-end. The record also includes the cross-examination of Miss Lerette and from this it is readily discernible that defense counsel had a great deal of familiarity with the background of the witness and conducted a cross-examination which was founded on certain knowledge which must have required some investigation into her background.

■ The mere fact that the testimony of a rebuttal witness may be damaging does not demonstrate that type of "palpable error" which must be shown to support a finding of error in the failure to grant a continuance.

## III

There were four instances in which testimony was admitted over objection to which we now give independent consideration.

A

The State introduced the testimony of an admittedly "very well qualified" forensic pathologist to assist in the effort to prove that Ifill was the operator of the motor vehicle at the time of the fatal accident.

From a personal examination of the wrecked automobile, written reports of the post-mortem examinations of the three decedents, and the medical records depicting the treatment of Ifill following the accident, the pathologist testified, "it is my feeling that if anyone survived, it would have to be the person who was in the driver's seat." [5]

This witness had inspected the damage to the interior of the motor vehicle, giving particular attention to the right windshield pillar and the right dashboard "about at the level of where the mid chest should be." There were so-called transfer marks, i. e., "evidence of something having hit the roof" above the positions which would normally be occupied by passengers in the back seat. He also noted the absence of any serious damage to the steering wheel or to the roof area over the driver's seat. He testified "there was minimal damage to the steering wheel which was not broken or distorted, but merely displaced somewhat" and, "the only significant damage or indication of contact was to the sun visor, to the bottom of the steering wheel and to the region where the right knee should have been."

The witness testified that he had been involved in "about a thousand medical legal cases over a period of nearly thirty years." During the course of this experience in "about fifty instances" he had occasion to examine vehicles involved in automobile accidents and in making comparisons with respect to those vehicles and injuries disclosed in post-mortem examinations. Such experience, of course, may be utilized to support any ultimate conclusion reached by an expert. *State v. Clapp*, 335 A.2d 897 (Me. 1975).

Appellant conceives the State's proffer of this evidence as an effort at "accident reconstruction." In urging the inadmissibility of this testimony he relies heavily on *Parker v. Hohman*, 250 A.2d 698 (Me. 1969), in which it was held to have been error to allow an expert to express an opinion, reconstructing the position of vehicles at the time of an accident because the opinion was "based upon too many assumed factors" and, therefore, became conjecture. We feel the instant case is readily distinguishable. The expert witness in *Parker* necessarily had to premise his opinion, at least in part, upon some unproven assumptions. On the facts before us the expert witness based his conclusions not on unproven assumptions but, rather, on the physical facts demonstrated by medical records and by his own observations of the vehicle involved. The thrust of his testimony was not to opine how this particular accident happened but merely to express an opinion about the survivor's position in the

5. The medical examiner with respect to the three decedents described in detail the physical injuries which resulted in their deaths. Wallace Bruce had received a fracture at the base of the skull, numerous rib fractures, a lacerated liver, with the specific cause of death being "massive hemorrhage following rib fractures with perforation of the heart." Irenee Dion had multiple depressed fractures of the skull as well as fractures of both legs, the specific cause of death being "multiple injuries, especially about the head and, particularly, multiple skull fractures with lacerations of brain substance." Edward Rice received "multiple fractures of the skull and right side of the face, including cheek bone and bones of the right orbit." Additionally, the right side of the face was "shoved in and depressed with relation to the left half of the face," a fracture of the right femur and right forearm, fractures of the left seventh through twelfth ribs and of the right seventh through ninth ribs, lacerations of both lungs and of the liver. The specific cause of death was "multiple injuries, particularly lacerations of the skull and massive laceration of the liver." Robert Ifill was treated at a Waterville Hospital, having received a three inch laceration of the upper lip, a small laceration of the forehead, and a fractured nose. When seen by his doctor both eyes were black and blue.

vehicle at the time of the accident. In short, his ultimate conclusion was premised on established facts and not on unproved assumptions.

■ The qualification of an expert is a preliminary question which must be decided by a presiding justice whose ruling may only be reversed on a showing of abuse of that discretion. *State v. Thomas*, 299 A.2d 919 (Me. 1973); *Parker v. Hohman, supra*. Having thus qualified, the opinion of an expert is admissible if it is based on a proper factual foundation. Since this was the case here, there was no error in admitting this testimony.

■ Dealing with this same witness, appellant also has suggested the lack of any hypothetical question as a prelude to the doctor's testimony. The forensic pathologist had first hand knowledge of the interior condition of the Ifill car following the accident, and his testimony descriptive of this was not questioned. Additionally, the injuries to the three decedents and Ifill stated in medical terms were not disputed. His opinion, being premised on both his personal knowledge and the undisputed medical facts, may be elicited by a direct question, a hypothetical question under such circumstances not being required.[6]

### B

■ Four days after the accident the vehicle was minutely examined by Albert L. Godfrey, Sr. As a result of this examination he testified to certain "contact points" which would indicate where an occupant's body may have struck interior points in the vehicle during the collision process. Having observed contact points on the dashboard facing the passenger seat as well as on the door on the passenger side, Mr. Godfrey observed certain cloth fibers within these points which were con-

sistent in color with the trousers worn by Edward Rice.

Appellant has cited no authority to support his argument that this testimony was inadmissible. The record indicates that Mr. Godfrey was a traffic engineer with the Maine Department of Transportation with sixteen years experience. He had a degree in civil engineering as well as extensive experience in the field in investigating various types of automobile accidents, including those in which there has been a fatality. Assuming that a particular expertise is required in order to identify a "contact point," it is apparent that this witness had a "familiarity with the subject matter not possessed by the ordinary person." *State v. Fitzherbert*, 249 A.2d 760, 762 (Me. 1969). We find no abuse of discretion in the admissibility of the testimony. *State v. Thomas, supra*.

### C

■ A state trooper was allowed to testify over objection that he had observed Ifill and three other men standing in the yard of a filling station in Augusta at approximately 1:20 a. m. on the day of this accident. The objection was premised on the theory that the testimony was too remote and, therefore, irrelevant. As we view it, however, it did place Ifill in the company of three living persons only twenty minutes before the accident at a point within reasonable driving proximity to the locus of the accident. Therefore, the testimony did have probative value and was properly admitted. *State v. Taylor*, 343 A.2d 11 (Me. 1975); *State v. Northup*, 318 A.2d 489 (Me. 1974); *State v. Eaton*, 309 A.2d 334 (Me. 1973).

### D

■ The prosecution sought to prove continuity in the operation of the vehicle

---

6. *See, e. g., Rabata v. Dohner*, 45 Wis.2d 111, 172 N.W.2d 409 (1969); *Holecek v. Janke*, 171 N.W.2d 94 (N.D.1969); see also Rule 703 of the Maine Rules of Evidence, which becomes effective February 2, 1976.

by Ifill. Philip Dill, who had previously known Ifill, *without objection* testified he had observed a car leave a parking lot two hours prior to the accident and "Mr. Ifill stuck his head out [from the operator's seat] and said, 'Don't worry about it, I can handle this car.'" Subsequently, over objection he identified Ifill as the one who had made the quoted statement. We are not prepared to say there was error in allowing this identification.

The State relied on circumstantial evidence to prove appellant was the driver of the car when the fatal accident occurred and witnesses were introduced whose testimony tended to prove continuity of operation by Ifill during the preceding evening. Richard Hopper, *without objection,* testified that Ifill was driving the car shortly after Mr. Dill had seen him do so, and that around 1:00 a. m. on March 3 he again saw Ifill driving the car. *Without objection* this testimony was corroborated by one Lamarr Hodges.

Not only was Mr. Dill's initial testimony consent evidence but it was also relevant as tending to prove continuity of driving by the appellant prior to the accident.

The objection goes more to the weight of this testimony than to its admissibility. *State v. Hume,* 146 Me. 129, 78 A.2d 496 (Me. 1951); *State v. O'Toole,* 118 Me. 314, 108 A. 99 (1919).

### IV

■ By moving for judgment of acquittal at the conclusion of the State's case, renewing the motion when both the defense and the State had finally rested, moving for a new trial and for judgment n. o. v. after the guilty verdicts, appellant has clearly postured his appeal so that he may challenge the sufficiency of the evidence in its entirety to support judgments of guilt. *State v. York,* 324 A.2d 758 (Me. 1974); *State v. Cedre,* 314 A.2d 790 (Me.

1974); *State v. Collins,* 297 A.2d 620 (Me. 1972); *State v. Liberty,* 280 A.2d 805 (Me. 1971).

29 M.R.S.A. § 1315 provides:

"Any person who operates a vehicle with reckless disregard for the safety of others and thereby causes the death of another person, when the death of such person results within one year, shall be guilty of the offense of reckless homicide. . . ."

■ We have held that the offense of reckless homicide is "the crime of reckless driving with the superadded feature that the reckless driving caused the death of another within one year of the event." *State v. Grant,* 266 A.2d 232, 237 (Me. 1970). It is likewise settled beyond dispute that recklessness, in the criminal law, is established by proof of a degree of negligence or carelessness which may be denominated gross or culpable [7] and may be evidenced by operating a motor vehicle with reckless disregard for the safety of others. *State v. London,* 156 Me. 123, 162 A.2d 150 (1960).

■ As we have already indicated, there was competent evidence from which the jury could conclude beyond a reasonable doubt that Ifill was the operator of the motor vehicle at the time of the accident despite his own testimony claiming that Edward Rice was the operator and that he was in the rear seat behind the operator. As we have noted, Madeline Lerette observed him operating the vehicle and leave Augusta, headed toward the locus of the accident approximately ten minutes prior thereto. From the testimony of the forensic pathologist the jury could conclude that Ifill was the driver at all times thereafter since he was the sole survivor of the accident. This was further borne out by the testimony of Mr. Godfrey and from the fact that fibers from the trousers worn by Edward Rice were found in a po-

7. *State v. Jones,* 152 Me. 188, 126 A.2d 273 (1956).

sition consistent with Mr. Rice's occupying the front passenger seat. There was likewise testimony that hair found on the steering wheel and on the sun visor over the steering wheel matched that of Ifill and was inconsistent with hair taken from Mr. Rice.

We next address the question of whether there was a sufficient basis to justify the conclusion that the vehicle was being operated in a criminally negligent, or reckless, manner.

There was ample evidence that Ifill was under the influence of intoxicating liquor at the time of the accident. His activities during the preceding evening were described by various witnesses for an appreciable period prior to the accident and his consumption of a substantial amount of intoxicating liquor was adequately established.

Highway conditions on this particular morning were hazardous due to both poor visibility and slippery road conditions.

Only minutes before the accident the Ifill car was observed by the driver of another vehicle meeting it some three or four miles north of the point of the accident. This witness testified that as the Ifill car approached he was required to pull off the pavement "pretty near into the ditch" to avoid a collision and he spontaneously remarked to his wife that it "would never make Randolph that night."

The exact locus of the accident was accurately described to the jury, together with the curvatures of the road at that point. The jury could conclude that the Ifill car failed to negotiate completely a series of turns, left the road and collided directly and with great force with a house which was some distance therefrom. Photographs were admitted showing the condition of the vehicle and the house thereafter, from which the jury could well infer that the vehicle was going at an extremely high rate of speed under conditions totally inconsistent with any concept of prudent operation.

Our review of the record satisfies us beyond any doubt that the verdict of the jury was correct.

The entry is:

Appeals denied.

All Justices concurring.