**STATE of Maine**

v.

**James P. GERVAIS.**

Supreme Judicial Court of Maine.

Dec. 6, 1978.

Henry N. Berry, III, Dist. Atty., Peter G. Ballou, Deputy Dist. Atty., Portland, Robert Mullen, Law Student (orally), for plaintiff.

Dunlap, Wood & O'Brien by Gary C. Wood (orally), Portland, for defendant.

Before McKUSICK, C. J., and WERNICK, ARCHIBALD, DELAHANTY, GODFREY and NICHOLS, JJ.

WERNICK, Justice.

A two count indictment returned on March 8, 1977 accused defendant James P. Gervais of having committed, on or about February 15, 1977, the crimes of Burglary in violation of 17–A M.R.S.A. § 401 (Class B) and Theft in violation of 17–A M.R.S.A. § 353 (Class C). The charges arose from a burglary perpetrated on February 15, 1977 at the home of Richard and Bonnie Anderson in Falmouth, Maine. Defendant was tried before a jury in the middle of February, 1978 and found guilty of each count of the indictment. Appealing from the judgments of conviction, defendant asserts as claims of reversible error, all adequately preserved at the trial level, that: (1) the evidence is inadequate to support the convictions; and (2) the presiding Justice was wrong in admitting as evidence: (a) various prior criminal convictions of defendant, (b) purportedly expert testimony regarding an allegedly well-known method of operation for committing burglary, and (c) various items of property found during the search of an automobile, claimed by defendant to be an unconstitutional search because the evidence presented at a pre-trial suppression hearing failed to show that the police had acted lawfully in making the initial stop of the automobile.

We deny the appeal.

At approximately 1:00 o'clock in the afternoon of February 15, 1977 defendant was a passenger in an automobile owned and being operated by Terrance Mihill. Mihill drove the automobile into the driveway of the Anderson home, went to the door of the house, knocked, waited for a short time and then quickly entered. He proceeded directly upstairs to Mrs. Anderson's bedroom, removed some valuables from the dresser and returned downstairs. Mihill had been observed by the Andersons' son, Graham, who was watching and listening from his own bedroom. As Mihill left the house, he again became visible to Graham Anderson who saw him first approach the car, pointing to a red bundle he was holding in his hand, and then engage in a brief conversation with defendant. Shortly thereafter, Mihill

tossed the bundle through the car window. After some difficulty in getting the car started because of the cold and snowy weather conditions, Mihill drove away, with defendant still in the automobile.

Graham Anderson at once called the police. He furnished them the license number of the vehicle, and a description of the vehicle, of the color of its license plates, and of its operator. The police put an all-car bulletin on the air. Within a matter of minutes, Alfred Gamage, a police officer operating a cruiser, spotted the Mihill automobile proceeding in a direction opposite to him. He made a U-turn to follow and activated his blue lights. Very soon thereafter, the vehicle being pursued pulled off the road, as if there was "panic on the part of the operator", and came to a stop in an abandoned lot against a snowbank. Approximately at this time, another officer, Edmund Pelletier, arrived at the scene. Mihill and the defendant were ordered out of the automobile and placed under arrest. Searching the automobile, Officer Pelletier saw a red parka protruding from beneath the passenger seat of the automobile. He examined it, found it was rolled into a wad, and unrolling it, he saw that it contained a wallet, checkbook and some jewelry, all property of the Andersons.

Testifying on his own behalf, defendant claimed that he had in no way participated in Mihill's criminal activity. Defendant's story was that he had been drinking beer and was somewhat befuddled. He recalled that while he and Mihill were returning from an unsuccessful attempt to go horseback-riding in Gray, they became lost. The automobile began to run short of gas, so they stopped, twice, to ask for directions. At the second stop, the Anderson house, defendant remained in the car, relaxing with a beer and listening to music, while Mihill went to the house to ask for directions. According to defendant, Mihill must then have decided on the spur of the moment to commit a burglary. Defendant maintained that he knew nothing of a burglary until Mihill came out of the house holding a red bundle and shouting: "I pulled the score." Defendant claimed that

the conversation he was seen to have with Mihill was really an argument between them arising because defendant refused to take, or touch, the bundle. Mihill then tossed the bundle into the automobile, and he started to drive towards town, with defendant remaining a passenger. Soon, they noticed a police car's blue lights flashing behind them. Defendant wrestled for control of the steering wheel. This caused the automobile to leave the road and stop against a snowbank. The ensuing jar made the red parka bundle slide towards the passenger side of the car.

### 1. The Sufficiency of the Evidence.

On the evidence, and according to the instructions of law given them by the presiding Justice, the jury could have found defendant guilty as charged only on the basis that he was Mihill's accomplice. Defendant's contention on appeal is that such a finding is not justified on the evidence under the definition of "accomplice" set forth in 17–A M.R.S.A. § 57(3):

"A person is an accomplice of another person in the commission of a crime if:

"*A.* With the intent of promoting or facilitating the commission of the crime, he solicits such other person to commit the crime, or aids or agrees to aid or attempts to aid such other person in planning or committing the crime."

The evidence, says defendant, shows *only* that he was present at the scene of the crime, as a passenger in Mihill's automobile.

■ Defendant is correct that evidence showing a defendant's *mere* presence at the scene of a crime is inadequate to prove him an accomplice in the commission of the crime. We disagree with defendant, however, that the evidence here shows nothing but mere presence.

■ The evidence established that defendant was Mihill's friend. Even though defendant may not have been shown to engage in any overt act of assistance, his presence as a friend could be taken as a circumstance suggesting encouragement to Mihill. Cf. *State v. Mower*, Me., 317 A.2d

807, 812 (1974). When the further circumstance is added that, as the evidence showed, defendant, though fully free to disengage himself from Mihill, continued to ride with him after defendant knew that he had committed a burglary, a rational basis is provided for a conclusion that during the entire time of defendant's presence at the scene of the crime, he was aiding and abetting Mihill in the commission of burglary. *State v. Berube*, 158 Me. 433, 185 A.2d 900 (1962). It tends to buttress this conclusion that defendant took the stand and sought to give the jury an exonerating version of what had happened. The verdict makes plain that the jury disbelieved defendant's story. The jury's finding that defendant did not tell the truth about what had happened could properly be taken as additional indication of his guilty participation.

The evidence was sufficient to support the convictions.[1]

### 2. Admissibility of Defendant's Prior Criminal Convictions.

Defendant contends that the presiding Justice erred in admitting evidence, for the purpose of impeaching defendant's credibility as a witness, that defendant had previously been convicted of certain crimes.

Defendant relies on *State v. Roy*, Me., 385 A.2d 795 (1978) in attacking the admission in evidence of his prior convictions of the crimes of shoplifting and breaking, entering and larceny. Defendant argues that *Roy* requires as a matter of law the exclusion, here, of these prior convictions because (1) the crimes involved so closely resemble the crime for which defendant was on trial that the jury would be likely to use the evidence improperly: to give it substantive effect as proving a behavioral tendency in conformity to which defendant had acted in the present instance; and (2) the crimes of shoplifting and breaking, entering and larceny have little relevance to veracity.

Defendant's reliance on *Roy* is misplaced. *Roy* does not hold that the slight relevance to veracity of the crime involved in a prior conviction and its close resemblance to the crime for which defendant is being tried are facts *by themselves* requiring *in all cases* that the prior conviction be excluded as evidence to impeach defendant's credibility. In *Roy* it also appeared that the prosecution had improperly probed into the factual details of the crime involved in the prior conviction and made the jury aware that the victim of the incest for which defendant had been previously convicted was approximately the same age as the victim of the crime of indecent liberties for which *Roy* was on trial.

The case at bar is plainly distinguishable. Here, there are no independently prejudicial circumstances. Moreover, we cannot say that the presiding Justice was guilty of abuse of discretion in concluding that in contrast to the crime of incest involved in *Roy*, the crimes of shoplifting and breaking, entering and larceny have more than a minimal bearing on general credibility. As we said in *State v. Toppi*, Me., 275 A.2d 805, 810 n. 5 (1971):

> "[A]cts of deceit, fraud, cheating, or stealing, . . . are universally regarded as conduct which reflects adversely on . . . honesty and integrity."

See generally Field & Murray, *Maine Evidence* § 609.1.

As to the admission in evidence of defendant's prior conviction of the crime of assault with intent to kill, that crime is

> "punishable by . . . imprisonment for one year or more under the law under which . . . [defendant] was convicted, . . .."

It was therefore admissible to impeach defendant's credibility as a witness under the facial provisions of Rule 609(a) M.R.Evid. subject to a control, through the exercise of

---

1. Our decision in *State v. Carter and Shiplett*, Me., 391 A.2d 344 (1978), holding that the evidence there was insufficient to justify a jury conclusion that Shiplett was an accomplice of Carter as the perpetrator of the crime charged, is plainly distinguishable. The evidence failed to place Shiplett at the scene of the crime. It showed only that Shiplett was present with Carter 45 minutes after the robbery, Shiplett then being a passenger in an automobile operated by Carter which contained instrumentalities of the crime.

judicial discretion, to prevent *improper* prejudice to defendant.

We conclude that in all the circumstances here, the presiding Justice should be upheld in his exercise of discretion to admit as evidence defendant's prior convictions of crime. The record shows that the Justice carefully weighed the conflicting considerations, gave several carefully stated limiting instructions to the jury and prevented the prosecution from asking any questions of defendant concerning the circumstantial details of the crime involved in the conviction. It is thus plain that the Justice's balancing evaluation was as follows: (1) precisely because the basic battle here was over defendant's credibility, the prosecution was entitled to have the jury know of defendant's prior convictions, as information bearing on his general credibility; (2) the Justice believed that he was able to maintain a tight "control" over how the evidence would be presented (as he in fact did) and to give emphatic warnings to the jury (as he did) about the proper purpose of the evidence; and (3) thus, even though there was likely to be damage to defendant's testimonial credibility, it would be a legitimate damage rather than an *improper prejudice* to defendant. We cannot say that such a balancing of the interests at stake was an abuse of discretion.

### 3. The Testimony as to "Method of Operation."

Detective Mark Robbinson was permitted to testify at the trial that a commonly utilized "method of operation" to commit burglary is the so-called "directions job." The methodology is that the prospective burglar approaches a house and knocks on the door; if someone answers he asks for "directions", but if no one answers he goes ahead with the burglary.

This testimony was allowed in evidence after testimony was given as to whether Detective Robbinson was, in the language of the presiding Justice, "qualified." The testimony showed that Detective Robbinson had received training in the investigation of burglaries at a course given by members of the Federal Bureau of Investigation and members of the State Police. He also had actual experience in conducting numerous burglary investigations. In consequence of his special training and experience, Detective Robbinson said that he was familiar with various methods of operation identified as commonly used to commit burglaries.

Defendant contends on appeal that, in accordance with Rule 702 M.R.Evid.,[2] Detective Robbinson was not "qualified" to give testimony about methods of operation as commonly used in the commission of burglaries and, in any event, the jury did not need such "expert" assistance to determine the facts at issue. We reject each of these contentions.

■■■ Whether a witness is qualified to testify in the areas addressed by Rule 702 M.R.Evid. is a preliminary question for the presiding Justice; his determination will be reversed on appeal only as an abuse of discretion. *State v. Ifill*, Me., 349 A.2d 176 (1975). On the evidence here, we are satisfied that the presiding Justice acted within the bounds of sound discretion in treating Detective Robbinson as

"qualified . . . by . . . experience, training, or education, . . ."

to provide the jury with "specialized knowledge."

Moreover, the presiding Justice was not guilty of abuse of discretion in treating the "method of operation" evidence as relevant

"specialized knowledge . . . [which would] assist the trier of fact to understand the evidence or to determine a fact in issue, . . . ."

Included in defendant's exonerating story were admissions that (1) he was aware that Mihill went to the Anderson house to ask

---

**2.** Rule 702 M.R.Evid. provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

for directions, and (2) he remained with Mihill even after he learned that when no one came to the door of the Anderson house, Mihill entered and committed burglary therein. These facts made relevant, and of assistance to the jury, testimony by a qualified witness regarding the "directions" technique as a commonly recognized method of operation for committing burglaries. As stated in *Hooks v. United States*, D.C.App., 373 A.2d 909, 911 (1977),

"particularly in light of . . . [defendant's] protestation that he was an innocent bystander,"

the evidence as to method of operation was relevant and would help the jury to "appreciate the possible relationship between seemingly innocent acts."[3]

#### 4. The Alleged Unconstitutional Stop of the Automobile.

Defendant's last point on appeal is that the items of property belonging to the Andersons found during the search of the Mihill automobile should have been suppressed as evidence on the ground that the police stop of the automobile which led to the search was not shown to be lawful. The foundation of the claim is that only Officer Pelletier, who arrived after the stop had been made by Officer Gamage, gave testimony at the pre-trial suppression hearing. Defendant contends that the suppression hearing testimony of Officer Pelletier failed to show that Officer Gamage had a lawful basis to stop the Mihill automobile and therefore the stop should have been held unlawful. In consequence, argues defendant, the articles found in the ensuing search of the vehicle should have been suppressed

as evidence as the "fruit" of a "poisonous tree." See *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Without intimating whether or not defendant's ultimate conclusion would be correct were the premise of his argument true,[4] we reject the premise. We decide that the testimony of Officer Pelletier at the suppression hearing sufficiently showed a lawful basis for Officer Gamage's stop of the Mihill automobile. Officer Pelletier testified that he

"heard on the radio that another unit . . . [in the] area was stopping the vehicle they presumed was in question for the break in Falmouth . . ."

and that the stop was being made on Washington Avenue across from the Shopping Plaza. He added that he was headed in that direction and was so close to the spot when he heard the radio message that he "just pulled up and stopped." He observed that the stopped automobile had

"the number broadcast to us over the radio, the same number."

Defendant's contention is that it would violate the rule excluding hearsay as evidence if this testimony by Officer Pelletier is taken as proving that Officer Gamage had a lawful basis to stop the Mihill automobile. The claim is erroneous.

■ Officer Pelletier's testimony as to the statement he heard Gamage make over the radio is not impermissible hearsay for the purpose of proving that Officer Gamage was in radio communication about *his activity of stopping some vehicle*. In this respect, Gamage's radioed statement is within

---

**3.** In his brief on appeal defendant has mentioned that when "method of operation" testimony is to be allowed, other courts seem to favor a practice of giving the jury cautionary instructions warning the jury that the existence of such a technique does not establish that it was actually used in the case on trial, and that the jury must be careful to avoid indulging in surmise and conjecture. See *United States v. Jackson*, 138 U.S.App.D.C. 143, 144, 425 F.2d 574, 575 n.4 (1970) and *Quarles v. United States*, D.C.App. 308 A.2d 773, 775 (1973). It suffices to say, here, that defendant made no requests for such cautionary instructions and,

plainly, the failure of the presiding Justice to give them cannot be regarded as error so serious as to have deprived defendant of a fair trial.

**4.** Had there been an unlawful stop of the Mihill vehicle, it would nevertheless be arguable that the taint of the unlawful stop was entirely dissipated by the plainly lawful arrest of Mihill and the defendant made before Officer Pelletier searched the automobile—more particularly since probable cause for the arrest existed independently of any information derived from the stopping of the vehicle.

the "present sense impression" exception of Rule 803(1) M.R.Evid. By his radio statement Officer Gamage was "describing or explaining an event or condition" and he made the statement "while . . . [he] was perceiving the event or condition . . . ."

■ In addition, Officer Gamage's statement over the radio that he "presumed" the vehicle he was stopping was the one "in question for the break in Falmouth" is not impermissible hearsay as proving that he then had in his mind an awareness that there had been a break in Falmouth and that an automobile had been involved in it. For this purpose, the statement was admissible under Rule 803(3) M.R.Evid. as tending to prove Gamage's "then existing state of mind."

■ In sum, Officer Pelletier's testimony at the suppression hearing, as admissible evidence, proved that Officer Gamage was engaged in radio communication in connection with an ongoing police investigation concerning some vehicle which Gamage had become aware had been involved in a burglary in Falmouth. Thus, under both the majority and concurring opinions in *State v. Parkinson*, Me., 389 A.2d 1 (1978),

the collective knowledge of the police identifying the *particular* automobile involved in the Falmouth burglary is treated, for the purpose of evaluating the lawfulness of Officer Gamage's stop of the Mihill vehicle, as the knowledge of Officer Gamage. Officer Pelletier's testimony at the pre-trial suppression hearing therefore sufficiently showed that Officer Gamage had a rational basis to believe that the automobile he was stopping was the one which had been involved in the Falmouth burglary. Hence, his stop of the vehicle was lawful, and the stop being lawful, no "poisonous" tree existed of which the search of the automobile was the "fruit." Defendant's contention fails.

The entry is:

Appeal denied; each judgment of conviction is affirmed.

POMEROY, J., did not sit.