**Zena M. ANDREW, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–9997.**

Court of Appeals of Alaska.

July 30, 2010.

Rehearing Granted Aug. 20, 2010.[*]

---

* Rehearing granted and resolved in an unpublished order.

Tracey Wollenberg, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

W.H. Hawley, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

MANNHEIMER, Judge.

Zena M. Andrew appeals her conviction for first-degree burglary (burglary of a residence), an accompanying conviction for second-degree theft (for the property stolen during that burglary), and a separate conviction for second-degree theft for receiving or concealing many items of stolen property that were taken during earlier burglaries and thefts.

The evidence showed that Andrew's boyfriend, Brian L. Haws, also played a role in these crimes. In particular, with respect to the residential burglary and the accompanying theft, the evidence showed that Haws was the one who entered the residence and removed the property, while Andrew waited outside in Haws's car.

Andrew argues in this appeal that there was insufficient evidence to convict her of the burglary and the thefts. Andrew concedes that the evidence showed that she was present when Haws committed these crimes, and that she might have been aware that Haws was committing these crimes, but Andrew contends that there was no evidence that she actively participated in these crimes, or that she purposely aided or abetted Haws in planning or committing these crimes (the test for vicarious liability codified in AS 11.16.110).

Andrew acknowledges that the evidence may have been sufficient to prove that she assisted Haws in transporting and retaining the property that was stolen during the residential burglary. But Andrew argues that she performed these acts *after* the burglary and the theft were committed. She points out that a person who provides aid to a felon after the felony is over does not, by reason of this aid, become guilty of the underlying felony. Rather, the person is guilty of the separate crime of hindering prosecution as defined in AS 11.56.770.

For these reasons, Andrew contends that the evidence was insufficient to support her convictions for burglary and theft.

Alternatively, Andrew argues that even if the evidence was sufficient to convict her of burglary and theft based on her legal accountability for Haws's conduct, the evidence was still insufficient to convict her of these crimes based on her own personal conduct—and that, for this reason, the jury's verdicts must be overturned.

Andrew's argument on this point hinges on the fact the jury was not asked to declare whether they found Andrew guilty based on her own conduct, or (instead) based on her accountability for Haws's conduct under the rules set forth in AS 11.16.110(2). Rather, each of the jury's verdicts was a general verdict that did not specify the theory under which the jury found Andrew guilty. Andrew contends that these general verdicts are invalid because (1) the evidence was not sufficient to establish her guilt based on her own personal conduct and, (2) given the general nature of the verdicts, it is impossible to tell whether the jurors were unanimous in finding her guilty based on her complicity in Haws's conduct (a theory arguably supported by sufficient evidence), or whether some of the jurors erroneously found her guilty based on her own personal conduct (a theory that was not supported by sufficient evidence).

For the reasons explained in this opinion, we conclude that this proposed dichotomy is mistaken. The State was not required to prove that Andrew could be found guilty based on her personal conduct alone, nor was the State required to prove that Andrew could be found guilty based solely on the conduct of others for which was she was accountable. Rather, the State was required

to prove that the *combination* of (1) Andrew's personal actions and (2) the actions of others for which she could be held accountable under AS 11.16.110 was sufficient to establish Andrew's guilt of the burglary and the two thefts. We further conclude that the evidence presented at Andrew's trial satisfied this test.

Andrew separately argues that the State failed to present sufficient evidence that the property taken during the residential burglary was worth $500 or more—the threshold amount for second-degree theft. We agree with Andrew that the evidence fails to establish that the property was worth at least $500, and we therefore direct the superior court to amend the judgement on this count of the indictment to reflect a conviction for the lesser included offense of third-degree theft (*i.e.*, theft of property valued at $50 or more).

Finally, Andrew attacks her sentence on various grounds. For the reasons explained here, we uphold the superior court's sentencing decision.

*Underlying facts*

Because Andrew's major contention in this appeal is that the evidence is insufficient to support the jury's verdicts, we present the evidence here in the light most favorable to upholding the verdicts.[1]

In early September 2005, Haws and Andrew drove from Anchorage to the Kenai Peninsula. Haws contacted an old friend, Chris Parker, who lived in Sterling. Haws asked Parker if he and Andrew could stay at Parker's house, and Parker agreed.

Parker was living with his girlfriend, Misty Roberts. A few hours after Haws and Andrew arrived at the house, everyone decided to go out for food. They all got into Parker's car—a black Jeep Cherokee—and they were about to pull out of the driveway when, as luck would have it, two state troopers arrived to arrest Parker for a minor offense.

While the troopers were taking Parker into custody, Haws opened the rear door of the Jeep and demanded to know why Parker was being arrested. As Haws was opening the car door, one of the troopers observed Haws hand a metal pipe (the kind used to smoke drugs) to Andrew. (The troopers did not follow up on Haws's drug pipe.)

Parker was bailed out of jail by a friend, but in the meantime, Haws and Andrew went driving in Haws's car—a white Mercury Cougar.

Later that day, the Mercury Cougar was discovered parked near a residence owned by Charles Jackson.

Jackson was not currently occupying the house; he was trying to rent it or sell it. Jackson had telephoned a friend of his, Richard Miller, to ask him to retrieve some paperwork from the house. On the day in question, Miller and his son Benjamin drove out to Jackson's house to perform this errand.

Jackson's house had a long driveway: it ran between 50 and 100 feet from the road before reaching the parking pad next to the garage. When Miller and his son first approached Jackson's residence and viewed it from the road, everything appeared normal. However, as they drove up the driveway, Miller and his son observed a car—Haws's Mercury Cougar—parked alongside a fence, off the driveway and away from the parking area.

According to Miller's testimony, the Cougar was not visible unless one went up the driveway almost all the way to the garage.

(Haws's friend Chris Parker also testified that, when he arrived at the Jackson residence later that day (as we will explain), he thought that Haws's car was parked in a weird place: "pulled off aside of a dog run" rather than in the parking area next to the garage. Parker remembered asking Haws why, if Haws had come to inspect the house with an eye toward renting it, he had placed his car so far away.)

Richard Miller could see exhaust coming from the Cougar; in other words, the car

---

**1.** *See, e.g., Shorty v. State,* 214 P.3d 374, 383–84 (Alaska App.2009); *Newsom v. State,* 199 P.3d 1181, 1188 (Alaska App.2009).

was running. However, neither Miller nor his son could see anyone sitting in the car; it appeared to be unoccupied.

But as soon as Miller parked his own vehicle in the driveway, a man (Haws) "just seemed to appear almost out of nowhere". When Miller asked Haws what he was doing at the house, Haws replied that he was looking for a place to rent. Haws told Miller that he had driven up Jackson's driveway, thinking that it was a road that cut through the property; then, when Haws discovered that it was a driveway, and that it ended at the house, he had tried to turn his car around, but it became stuck in the mud.

At some point while Miller and his son were talking to Haws, Andrew—who had been in the Cougar all along—sat up in the passenger seat, so that she was now visible to the Millers. Benjamin Miller saw Andrew "putting some things in a bag". Much later, when the troopers searched Haws's car, they found that the glove box was empty of any identifying documents.

Miller and his son attempted to tow Haws's car from where it was stuck; they used a chain, and then a cable, but their efforts were unsuccessful. Then, thinking that there might be a tow rope inside the house, Miller and his son went into the house to see what they could find.

What they found was evidence of a break-in: they saw that a screen had been pulled from one of the windows, and that the window was open; Miller also saw that, inside the house, "stuff [was] strewn everywhere", and several drawers and cupboards had been pulled open.

Meanwhile, Haws followed the Millers into the house and was "st[i]ck[ing] to [them] like glue", trying to distract them. While inside the house, Haws was also talking on his mobile phone (using a headset), asking Chris Parker and Misty Roberts to come help him get his car free, or at least to come get him and Andrew. Parker and Roberts set out in Parker's Jeep Cherokee. As they drove, Haws continued to talk to them on his mobile phone, so that he could lead them to where he was.

(As we explained before, Haws's car was parked in a place where it was not visible from the road. Because of this, Haws had to verbally direct Parker to the Jackson residence driveway.)

When Miller and his son saw Parker's vehicle coming up the driveway, they began to be concerned for their own safety, so they coaxed Haws out of the house, and then they went back inside and locked the doors so that no one else could enter.

When Parker and Roberts arrived, Haws told them that he had already called a tow truck, and that he only needed them to help transfer the belongings from his Cougar into Parker's Jeep, and then give him and Andrew a ride back to Parker's house. These belongings consisted of a large number of small- to medium-size bags, as well as a wooden box. Roberts, Haws, and Andrew, and perhaps Parker, participated in transferring these bags and the box from the Cougar to the back compartment of Parker's Jeep. When they got back to Parker's house, everyone helped carry these bags and the box from the Jeep into the house, and then upstairs to the room where Haws and Andrew would be staying.

The clothing that Haws and Andrew were wearing had become soaked, and they asked Parker and Roberts if they could borrow some dry clothes. Roberts thought it was strange that, with all the bags of belongings that Haws and Andrew had brought with them, they did not have any spare clothing.

Things settled down, and the four people were about to order some pizza when the troopers knocked on the door. Parker and Roberts went out to meet the officers, but Haws and Andrew made themselves scarce; they went upstairs.

Standing outside the house, the troopers informed Parker that there had been a "robbery" (*i.e.,* a burglary and theft) at the house where Parker and Roberts had picked up Haws and Andrew earlier. When Parker disclaimed any knowledge of these crimes, the troopers asked if there was anyone else in Parker's house. Parker said that there was, and he led the troopers into his house—only to discover that Haws and Andrew were

nowhere in sight. Parker then led the troopers upstairs "to see where [Haws] and his girlfriend had [gone]".

Haws and Andrew had locked themselves into their bedroom—although they left all the belongings that had come from the Cougar piled in the middle of the floor outside the bedroom.

Both Parker and Trooper Sgt. Barry Wilson asked Haws and Andrew to come out of the bedroom, but they refused. Instead, they started pushing furniture in front of the bedroom door, to impede anyone who might attempt to enter. They also used clothing and other small items as stuffing to close off a vent hole that was near the floor. Through the door, Wilson could hear Haws coaching Andrew on what to say to the troopers.

At some point during this standoff, Andrew told Haws that she wanted out, but Haws apparently would not let her leave the bedroom.

After about an hour and a half, the troopers forced their way into the room. On the floor next to Andrew, the troopers found a woman's stolen credit card. As Haws and Andrew were being arrested, Haws instructed Andrew not to say anything to the troopers.

The bags and the wooden box that were piled outside of the bedroom contained stolen property from the Jackson residence and from several prior burglaries.

One of these bags contained women's underwear and feminine hair, skin, and hygiene products, as well as photographs of Haws and Andrew. These items apparently belonged to Andrew. This same bag contained jewelry that had been stolen in a prior burglary.

This bag also contained stationery from a Marriott Residence Inn. This hotel stationery was significant because, as explained above, the troopers found a woman's credit card next to Andrew when they entered the bedroom to make the arrest. This same credit card had been used (fraudulently) to pay for room charges at the Anchorage Midtown Marriott Residence Inn from September 2nd

through September 5th—in other words, just four days before Haws and Andrew were arrested.

Finally, this same bag contained notations of a driver's license number, a credit card number and accompanying expiration date, and an address—none of them Andrew's. This type of information could be used to make fraudulent purchases.

*The wording of the indictment in this case, the common-law distinctions between principals and accessories, and the abrogation of these distinctions under Alaska law*

Andrew's indictment charged her with three felonies: the burglary of the Jackson residence, the accompanying theft, and the separate theft (by receiving or concealing) of the property taken in the earlier burglaries and thefts. According to the wording of the indictment, Andrew was charged with committing these crimes "as [a] principal or [an] accessory".

As we are about to explain, the terms "principal" and "accessory" had precise meanings at common law, and different rules applied to the prosecution and punishment of principals and accessories. But the distinction between principals and accessories (to be more precise, the distinction between principals and accessories "before the fact") was abrogated in Alaska by statute more than one hundred years ago.

In accordance with the abrogation of these common-law distinctions, Alaska law prior to 1980 required that all persons concerned in the commission of a felony "be prosecuted, tried, and punished as principals".[2] And today, under Alaska's current criminal code, the terms "principal" and "accessory" are not even used (much less defined).

In the current appeal, Andrew and the State agree that the archaic wording of Andrew's indictment was intended to mean that Andrew was charged with committing the burglary and thefts either through her own personal conduct, or through the conduct of another person (*i.e.*, Haws) for which she was

---

2. Former AS 12.15.010.

legally accountable, or through a combination of both.

This is the general rule for criminal liability codified in AS 11.16.100. This statute declares that a person can be convicted of a crime if the offense was committed "by [their] own conduct[,] or by the conduct of another for which [that] person is legally accountable under [the rules set forth in] AS 11.16.110, or by [a combination of] both."

Nevertheless, many of Andrew's arguments in this appeal hinge on the charging language found in the indictment—and on the concomitant theory that this language charges two distinct theories of culpability.

### (a) The common-law distinctions between principals and accessories

In order to analyze Andrew's arguments concerning the sufficiency of the evidence to establish her guilt of the burglary and the thefts in this case, we must first examine the common-law doctrines defining the various types of participants in a criminal act, and then examine the statutes that modified the application of these doctrines in Alaska.

At common law, there were four categories of participants in a felony offense: principals in the first degree, principals in the second degree, accessories before the fact, and accessories after the fact.

Principals in the first degree were the people who directly committed the offense. Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* (3rd edition 1982), pp. 722, 736.

Principals in the second degree were people who were present at the scene of the crime and either aided or encouraged the commission of the offense or were immediately available to aid the commission of the offense. *Id.*, pp. 722, 738. Because the underlying test for principals in the second degree was whether the person was immediately available to aid or abet the commission of the offense, the common law deemed a person to be constructively "present" at the scene of the crime (and, thus, a principal in the second degree) even if they were some distance away, so long as they were available to assist in the commission of the offense— for example, a getaway driver who waited down the street, or even a person who was posted on a distant building or mountaintop, armed with a rifle to protect the direct perpetrators, or equipped with a signaling device to alert the perpetrators if someone was coming. *Id.*, p. 741.

(We note that, under the State's theory of Andrew's case, Andrew's involvement in the burglary and theft at the Jackson residence would have made her a principal in the second degree as that term was understood at common law. The State alleged that Andrew was present at the scene of the crime, and that she accompanied Haws for the purpose of aiding or abetting him in his commission of the burglary and theft. If this allegation was proved, then even if the burglary and theft were committed solely through Haws's personal conduct, Andrew would still be classified as a principal in the second degree with regard to those crimes.)

Accessories *before* the fact were the people who solicited, aided, or encouraged the commission of the felony, but who were not present (either physically or constructively) at the scene of the crime. *Id.*, pp. 744–45.

Accessories *after* the fact were the people who, acting with knowledge that another person had committed a felony, rendered aid to the other person with the intent of hindering that person's detection, arrest, conviction, or punishment. *Id.*, pp. 748–751.

At common law, the first three categories of participants—that is, principals in the first or second degree, and accessories before the fact—could all be directly prosecuted and convicted of the felony offense. However, the distinctions between these three types of participants were important because the common law prescribed different rules for the prosecution and punishment of felony offenders depending on the offender's status as a principal in the first degree, a principal in the second degree, or an accessory before the fact. *Id.*, pp. 751–58.

Accessories after the fact were not held accountable for the underlying felony; rather, they were guilty of a separate offense (*viz.*, participating as an accessory after the fact to a felony), and this offense carried a lesser degree of guilt. *Id.*, p. 728.

*(b) The abrogation of the common-law distinctions between principals in the first degree, principals in the second degree, and accessories before the fact*

In the nineteenth century, many jurisdictions enacted statutes to abrogate the common-law rules that distinguished principals in the first degree, principals in the second degree, and accessories before the fact. An example of this legislation is found in the federal statutes governing the Territory of Alaska.

Beginning with the Carter Code of 1900, Alaska law contained a provision declaring "[t]hat all persons concerned in the commission of a crime, ... whether they directly commit the act constituting the crime or aid and abet in its commission, though not present, are principals, and [are] to be tried and punished as such." Thomas H. Carter, *Laws of Alaska* (1900), Part I (the Penal Code), § 186.

A corresponding provision was found in Part II of the Carter Code (the Code of Criminal Procedure), § 58:

[T]he distinction between an accessory before the fact and a principal, and between principals in the first and second degree in cases of felony, is abrogated, and all persons concerned in the commission of a felony, whether they directly commit the act constituting the crime, or aid and abet ... its commission, though not present, must be indicted, tried, and punished as principals[.]

For a Ninth Circuit decision construing Carter Code, Part I, § 186, *see Rosencranz v. United States*, 155 F. 38 (9th Cir.1907). For a case construing the predecessor Oregon statute (Hill's Annotated Laws of Oregon, § 2011 (1864)), see *State v. Moran*, 15 Or. 262, 14 P. 419 (1887). In both *Rosencranz* and *Moran*, the wording of the indictment charged the defendant with personally committing the acts constituting the crime (*see Rosencranz*, 155 F. at 38; *Moran*, 14 P.

at 420), but the government's evidence at trial showed that the defendant aided or abetted someone else's commission of the crime. (*See Rosencranz*, 155 F. at 41–42; *Moran*, 14 P. at 426.) Both the Ninth Circuit and the Oregon Supreme Court declared that this difference was immaterial, and they rejected the defendants' challenges to the supposed variance. See *Rosencranz*, 155 F. at 42–43; *Moran*, 14 P. at 426–27.

The abrogation of the common-law distinctions between principals in the first degree, principals in the second degree, and accessories before the fact remained a part of Alaska law until statehood. *See* §§ 65–3–2 and 66–9–23 of the Alaska Compiled Laws Annotated of 1949. And upon statehood, the Alaska legislature again codified the abrogation of the common-law rules: *see* former AS 12.15.010.[3]

The Alaska Supreme Court construed these post-statehood statutes in the same way that the Ninth Circuit had construed the pre-statehood statutes in *Rosencranz*. In other words, even when an indictment charged a defendant with personally committing a crime, at the defendant's trial the government could properly introduce and rely on evidence that the defendant aided or abetted another person's commission of the crime. Our supreme court held that this was not a material variance from the indictment—because AS 12.15.010 abrogated the common-law distinctions between principals in the first degree, principals in the second degree, and accessories before the fact, and because the statute further declared that "all persons concerned in the commission of a crime, whether they directly commit the act constituting the crime or, though not present, aid and abet in its commission, [were to] be prosecuted, tried, and punished as principals." See *Morris v. State*, 630 P.2d 13, 15–16 (Alaska 1981); *Scharver v. State*, 561 P.2d 300, 302 (Alaska 1977); *Baker v. State*, 905

---

**3.** Former AS 12.15.010 used essentially the same wording as the Carter Code provision:

    **Abrogation of Distinctions Between Accessories and Principals.** The distinction between an accessory before the fact and a principal, and between principals in the first and second

degree is abrogated; and all persons concerned in the commission of a crime, whether they directly commit the act constituting the crime or, though not present, aid and abet in its commission, shall be prosecuted, tried, and punished as principals.

P.2d 479, 485–86 (Alaska App.1995); *Miller v. State,* 866 P.2d 130, 137 (Alaska App.1994).

Moreover, for purposes of assessing the verdict in a criminal case, the distinction between holding a person accountable for a crime based on their own conduct and holding that person accountable based on another person's conduct was deemed immaterial. *See State v. McDonald,* 872 P.2d 627, 655 (Alaska App.1994), and *Totemoff v. State,* 866 P.2d 125, 129 (Alaska App.1993),[4] where this Court held that a trial jury does not need to unanimously agree as to whether the defendant personally performed the acts constituting the crime or, instead, solicited or aided or abetted someone else's commission of the crime.

With regard to the fourth category of participants in a felony at common law, "accessories after the fact", Alaska statutory law carried forward the doctrine that accessories after the fact were not accountable for the underlying felony, but were rather guilty of a separate, less blameworthy offense. Part I, § 187 of the Carter Code declared "[t]hat all persons who, after the commission of any felony, conceal or aid the offender, with knowledge that he has committed a felony and with intent that he may avoid or escape from arrest, trial, conviction, or punishment, are accessories."

(As can be seen from the wording of Part I, § 187, the Carter Code used the term "accessory" as a shorthand for "accessory after the fact"—because, under the sibling provisions of the Carter Code (Part I, § 186, and Part II, § 58), all people who would have been categorized as "accessories before the fact" at common law were now deemed principals.)

This approach to accessories after the fact remained a part of Alaska law until state-hood. *See* §§ 65–3–3 and 65–3–5 of the 1949 Alaska Compiled Laws Annotated. And upon statehood, the Alaska legislature re-codified this provision as former AS 12.15.020:

> **Accessories after the Fact.** All persons who, after the commission of any felony, conceal or aid the offender with knowledge that he has committed a felony and with intent that he may avoid or escape from arrest, trial, conviction, or punishment are accessories.... Such persons are separately punishable for their distinct offense [under] AS 11.10.050[.] [5]

Under Alaska's current criminal code, the crime of being an "accessory" to a felony as defined in former AS 12.15.020—*i.e.,* what the common law would have called an accessory after the fact—is now encompassed by the crime of hindering prosecution in the first degree, AS 11.56.770.

*(c) The enactment of Alaska's current criminal code, and the Alaska Legislature's complete elimination of these common-law categories*

In the late 1970s, the Alaska Legislature undertook to completely revise Alaska's criminal law. This revision was enacted as SLA 1978, ch. 166, and the new criminal code took effect on January 1, 1980.[6]

Under our current criminal code, two statutes—AS 11.16.100 and AS 11.16.110—contain the basic rules for determining one person's vicarious liability for the conduct of another. These statutes are derived from two Oregon statutes, ORS 161.150 and 161.155.[7] And these Oregon statutes, in turn, were based on Section 2.06 of the Model Penal Code.[8] Accordingly, to assess the meaning and proper application of AS

---

**4.** *Reversed on other grounds,* 905 P.2d 954 (Alaska 1995).

**5.** Former AS 11.10.050 provided: "Except ... where [otherwise] prescribed by law, an accessory to a felony ... is punishable by imprisonment in the penitentiary for not less than one year nor more than five years, or by imprisonment in a jail for not less than three months nor more than one year, or by a fine of not less than $100 nor more than $500."

**6.** *See* SLA 1978, ch. 166, § 25.

**7.** *See* Alaska Criminal Code Revision, Tentative Draft, Part 2 (February 1977), p. 108.

**8.** *See State v. Burney,* 191 Or.App. 227, 82 P.3d 164, 168 (2003).

11.16.100 and AS 11.16.110, we turn first to the Model Penal Code.

In Section 2.06 of the Model Penal Code (the final version, issued in 1962),[9] the American Law Institute advocated a new approach to the question of identifying and classifying the participants in a crime.

Rather than relying on the common-law categories of principals in the first degree, principals in the second degree, and accessories before the fact, Model Penal Code § 2.06(1) simply declared, "A person is guilty of an offense if it is committed by his own conduct[,] or by the conduct of another person for which he is legally accountable [under the rules set forth in the other subsections of § 2.06], or both."

Under the Model Penal Code approach, *all* the participants in a criminal venture are deemed "accomplices" to the offense. As explained in the Comment to § 2.06, the term "accomplice" was intended to be understood "as the broadest and least technical [term] available to denote criminal liability. Unlike 'accessory'[,] it has no special meanings under either common law or modern legislation." [10]

(We note that the Alaska Statutes use the term "accomplice" in this same broad sense. *See* AS 12.45.020 (requiring that the testimony of an "accomplice" be corroborated) and AS 12.55.155(d)(2) (allowing mitigation of a presumptive sentence if the defendant, "although an accomplice, played only a minor role"). These are the only two places where the term "accomplice" appears in Title 12 of the statutes, and this term is not found at all in Title 11.)

Under the Model Penal Code approach, the guilt of any particular defendant is to be judged by assessing the defendant's *mens rea* (that is, the defendant's culpable mental state) and the combination of (1) the defendant's own conduct and (2) the conduct of any other person for which the defendant is accountable.[11]

With regard to aiders or abettors who would have been classified either as principals in the second degree or as accessories before the fact under the common law (depending on whether they were present at the scene of the crime), the Model Penal Code substituted a new definition of vicarious liability in § 2.06(3)(a):

A person is an accomplice of another person in the commission of an offense if[,] with the purpose of promoting or facilitating the commission of the offense, he

(i) solicits [the] other person to commit [the offense], or

(ii) aids or agrees or attempts to aid [the] other person in planning or committing [the offense.]

Under this provision of the Model Penal Code, a defendant can be held accountable for criminal conduct performed by another person if the government proves that the defendant performed one of the acts specified in § 2.06(3)(a)—*i.e.*, soliciting another person to engage in the criminal conduct, or agreeing to aid someone else in planning or committing the criminal conduct, or actually aiding or attempting to aid someone else in planning or committing the criminal conduct—and if the government proves that the defendant performed that act with the accompanying purpose of promoting or facilitating the commission of the offense.

The Comment to § 2.06 explains that, even though § 2.06 defines these various modes or theories of complicity in a crime, these modes or theories were codified "[only] for the purpose of [elucidating] their content." [12] The drafters of the Model Penal Code did not intend for "[these] distinctions [to] have procedural significance." Rather, "[as is true] in the states that have abolished the common

9. *See* American Law Institute, *Model Penal Code and Commentaries* (Official Draft, 1962).

10. American Law Institute, *Model Penal Code and Commentaries* (Official Draft, 1962, and Revised Comments, 1985), Part I, General Provisions (§§ 1.01 to 2.13), p. 306.

11. *See* Model Penal Code § 2.06(2)-(3). This aspect of the Model Penal Code is more fully explained in *Riley v. State*, 60 P.3d 204, 220–21 (Alaska App.2002).

12. American Law Institute, *Model Penal Code and Commentaries* (Official Draft, 1962, and Revised Comments, 1985), Part I, General Provisions (§§ 1.01 to 2.13), p. 299.

law distinctions between principals and accessories, it would suffice under [the Model Penal Code] to [merely] charge commission of the substantive crime ... [without] declar[ing] that the offender is a 'principal' [or an 'accessory before the fact'].'' [13]

The Oregon Legislature adopted this approach to criminal liability when it revised the Oregon criminal law in 1971 and enacted Oregon Statutes 161.150 and 161.155. These two statutes were taken almost *verbatim* from the Model Penal Code.[14]

The first of these statutes, ORS 161.150, states: "A person is guilty of a crime if it is committed by the person's own conduct[,] or by the conduct of another for which the person is criminally liable, or both." The second of these statutes, ORS 161.155, declares that "[a] person is criminally liable for the conduct of another person constituting a crime if[,] [w]ith the intent to promote or facilitate the commission of the crime[,] the person ... [s]olicits or commands [the] other person to commit the crime; or ... [a]ids or abets or agrees or attempts to aid or abet [the] other person in planning or committing the crime[.]"

Alaska's counterparts to these Oregon statutes are AS 11.16.100 and AS 11.16.110.

AS 11.16.100 contains the general rule for criminal liability—the rule derived from § 2.06 of the Model Penal Code and from Oregon Statute 161.150. Under our statute, a defendant can be convicted of a crime if the crime was committed "by [their] own conduct[,] or by the conduct of another for which the [defendant] is legally accountable under [the rules set forth in] AS 11.16.110, or by [a combination of] both."

AS 11.16.110 contains the rules for determining when a defendant can be held accountable for the conduct of another person. Again, our statute adopts the general approach advocated in the Model Penal Code and Oregon Statute 161.155. The pertinent portion of the statute reads:

**Legal accountability based upon the conduct of another.** A person is legally accountable for the conduct of another constituting an offense if[,] ... with intent to promote or facilitate the commission of the offense, the person ... solicits the other to commit the offense[,] or ... aids or abets the other in planning or committing the offense[.]

These statutes do not rely on (or even mention) the common-law concepts of "principal" and "accessory before the fact". Indeed, as we have already explained, the terms "principal" and "accessory" do not appear anywhere in the revised Alaska criminal code.

Rather, as stated in the Commentary to Tentative Draft 11.16.100, our criminal code embodies the principle that, "[w]hen criminal liability exists, it is immaterial whether the elements of the crime are satisfied by the defendant's own behavior, or by the behavior of another person for which he is accountable, or by both." Alaska Criminal Code Revision, Tentative Draft, Part 2 (February 1977), p. 30.

The drafters of our revised code acknowledged that Alaska's former criminal code did not contain any counterpart to AS 11.16.110—*i.e.*, a statute specifying the elements that the government is required to prove in order to establish that one person is legally accountable for the conduct of another. Tentative Draft, Part 2, p. 30. However, the drafters stated that AS 11.16.110 was intended to substantially recapitulate Alaska's common law of accomplice liability as that law had been developed by the Alaska Supreme Court in various cases. *Ibid.*[15] In particular, the drafters declared that the culpable mental state required by AS 11.16.110(2)—"intent to promote or facilitate the commission of the offense"—was essentially a restatement of the pre-existing rule set forth in *Tarnef v. State*, 512 P.2d 923, 928

13. *Ibid.*

14. *See* Oregon Laws 1971, ch. 743, §§ 12–13. *See also State v. Burney*, 191 Or.App. 227, 82 P.3d 164, 167–68 (2003).

15. The drafters cited *Evans v. State*, 550 P.2d 830 (Alaska 1976); *Galauska v. State*, 527 P.2d 459 (Alaska 1974); and *Anthony v. State*, 521 P.2d 486 (Alaska 1974). Tentative Draft, Part 2, p. 30.

(Alaska 1973), and *Thomas v. State*, 391 P.2d 18, 25 (Alaska 1964).[16]

Now that we have summarized and explained Alaska's law of complicity—that is, the law under which one person can be held vicariously responsible for another person's conduct—we turn to Andrew's contentions in this appeal.

> *Whether liability based on one's personal conduct and liability based on one's vicarious responsibility for another person's conduct constitute distinct theories of criminal responsibility for purposes of pleading and proof under Alaska law*

As we have already explained, Andrew's main arguments in this appeal involve challenges to the sufficiency of the evidence to support her convictions. With respect to each of the three counts in the indictment, Andrew's arguments are structured in the following way:

Andrew first asserts that the evidence is insufficient to establish her guilt based on her own personal conduct, and she then separately asserts that the evidence is insufficient to establish her guilt based on her vicarious liability for Brian Haws's conduct. Finally, Andrew asserts (in the alternative) that even if the evidence is sufficient to establish her guilt based on her vicarious liability for Haws's conduct, but not sufficient to establish her guilt based on her own personal conduct, the jury's verdicts are flawed because the jury returned "general" verdicts— *i.e.*, the jurors did not specify which theory of culpability they found to be proved—and, thus, it is impossible to tell whether the jury convicted Andrew based on a theory that was supported by the evidence (*i.e.*, vicarious liability) or on a theory that was not supported by the evidence (*i.e.*, personal liability).

In other words, Andrew's approach to this case rests on the underlying premise that, under Alaska law, there is a distinction between proof of culpability based on one's own personal conduct and proof of culpability based on one's vicarious responsibility for someone else's conduct under the rules set forth in AS 11.16.110.

This approach is inconsistent with the legislature's longstanding efforts to eliminate the common-law distinctions between principals in the first degree, principals in the second degree, and accessories before the fact.

As explained earlier in this opinion, these latter two categories of participants in a felony—*i.e.*, principals in the second degree and accessories before the fact—were both held accountable under the theory that they were vicariously liable for the acts committed by principals in the first degree. (The difference was that principals in the second degree were present at the scene of the crime, while accessories before the fact were not.)

But as we have also explained, Alaska law draws no distinction between, on the one hand, principals in the first degree (*i.e.*, those persons who commit a crime by their own personal conduct) and, on the other hand, principals in the second degree and accessories before the fact (*i.e.*, those persons who are being held vicariously liable for the conduct of principals in the first degree). This distinction has not existed in Alaska law for over a century.

As far back as the Carter Code of 1900, Alaska law declared that all persons concerned in the commission of a felony were to "be prosecuted, tried, and punished as principals".[17] And under Alaska's current criminal code, the terms "principal" and "accessory" are not even used. Instead, we have a statute—AS 11.16.100—which declares simply that people are responsible for a crime if it was committed "by [their] own conduct[,] or by the conduct of another for which [they are] legally accountable under AS 11.16.110, or by [a combination of] both."

This last clause of AS 11.16.100—the language that speaks of holding a person accountable for a crime based on a "combination" of their own personal conduct and their vicarious liability for the conduct of one or more other people—is inconsistent with the approach taken by Andrew in the

---

**16.** Tentative Draft, Part 2, p. 31.

**17.** Carter Code, Part II, § 58.

current appeal. Under this statute, the government is not required to prove that the crime was committed either wholly through the defendant's own conduct or wholly through the conduct of others for which the defendant is vicariously liable. Rather, a person's criminal liability is evaluated based on a combination of these two. Accordingly, the government is not required to show that the evidence supporting one or the other of these theories of culpability would be sufficient, standing alone, to survive a motion for a judgement of acquittal.

This conclusion is most easily illustrated in cases where a crime is jointly committed by several co-defendants, each of whom contributes toward the commission of the crime, but none of whom individually commits all the acts needed to constitute the crime. For instance, in *Baker v. State*, 905 P.2d 479 (Alaska App.1995), three men decided to rob a pizza delivery person. All three men lay in wait for the victim; then, when the delivery person arrived, one of the defendants began to beat the victim, while another defendant grabbed the pizzas.[18] One of the issues in *Baker* was a dispute as to which defendant had done what.[19] But even if the precise role of each defendant had been clearly revealed by the evidence, it still would have been true that, of the two active perpetrators, neither of them could be convicted of robbery based solely on their own personal conduct, or based solely on the conduct of the other. The jury's verdict necessarily had to rest on the "combination" clause of AS 11.16.100.

A related doctrine is that the jurors need not be unanimous as to the precise role that a particular defendant played in the commission of the crime, as long as the jurors are unanimous in concluding that the combination of the defendant's personal conduct and the conduct of the defendant's accomplices (*i.e.*, conduct for which the defendant can be held vicariously responsible under AS 11.16.110) is sufficient to constitute the crime.

In *State v. McDonald*, 872 P.2d 627 (Alaska App.1994), the defendant was charged with being an accomplice to a murder. The jurors were instructed that, in order to justify McDonald's conviction of this crime, the State was required to prove that he "[personally] caused the death of [the victim], [or] solicited another person to cause her death, or aided or abetted another in planning or committing the acts causing the death of [the victim]." *Id.* at 655. On appeal, McDonald contended that this jury instruction potentially deprived him of jury unanimity, because some of the jurors might have concluded that he aided or abetted another person's commission of the murder, while other jurors might have concluded that McDonald personally committed the murder. *Ibid.*

This Court rejected McDonald's argument. We held that a jury is not required to be unanimous as to whether the defendant personally committed the acts constituting the crime or, instead, performed an act of solicitation, aiding, or abetting which rendered the defendant accountable for another person's acts. *Ibid. Accord: Totemoff v. State*, 866 P.2d 125, 129 (Alaska App.1993).

Andrew argues that this Court applied a contrary rule in an unpublished decision: *Stone v. State*, Alaska App. Memorandum Opinion No. 1383 (April 22, 1987), 1987 WL 1359302. The defendant in *Stone* was working as a caregiver at Harborview, a residential facility for developmentally disabled persons. *Id.* at *1. A student intern at Harborview reported that Stone and a co-worker named Collins had, in separate incidents, thrown a basketball at one of the residents—and that, in *one* of these incidents, the basketball struck the victim in the head. *Ibid.* According to the intern's testimony, these two incidents occurred about thirty minutes apart, and the intern was no longer sure whether the victim was struck during the first incident in which Stone threw the basketball or during the second incident in which Collins threw the basketball. *Ibid.*

Stone was charged with the misdemeanor of harassment under two alternative theories. The State's first theory was that the victim was struck in the head during the incident in

---

**18.** *Baker,* 905 P.2d at 480–81.

**19.** *Id.* at 485–87.

which Stone personally threw the basketball. The State's alternative theory was that the victim was struck in the head during the later incident in which Stone's co-worker, Collins, threw the basketball—but that Stone was vicariously responsible for his co-worker's misconduct because Stone's earlier act of throwing the basketball at the victim served as an incitement or encouragement for Collins to do the same thing thirty minutes later. *Id.* at *2.

On appeal, this Court concluded that the evidence was sufficient to convict Stone under the theory that he personally struck the victim with a basketball. *Ibid.* However, this Court concluded that there was insufficient evidence to support Stone's conviction under the theory of vicarious liability: even though the evidence suggested that Stone's earlier act of throwing the basketball had, in fact, encouraged Collins to do the same thing later, there was essentially no evidence that Stone *intended* his act to serve as an encouragement to Collins. *Ibid.* In other words, using the terminology of AS 11.16.110(2), the evidence was not sufficient to establish that Stone acted "with intent to promote or facilitate" Collins's later act of harassment.

This Court then ruled that Stone's conviction had to be reversed:

> Both theories [of culpability] went to the jury. We have determined that one theory, but not the other, was supported by [sufficient] evidence. [Because the] jury returned a general verdict[,] it is impossible ... to determine which theory resulted in Stone's conviction. Thus, we must reverse his conviction and remand [this case] for a new trial.

*Stone,* 1987 WL 1359302 at *3.

Andrew relies upon this passage from *Stone* as authority for the proposition that when a defendant is potentially guilty of an offense based on their own conduct or, alternatively, based on their vicarious responsibility for other people's conduct, and when the jury returns a general verdict that does not specify the precise basis of the defendant's culpability, the State's evidence must be sufficient to establish the defendant's guilt under *both* theories, independently.

Application of this rule led to a correct resolution of Stone's case. However, despite the implication of the above-quoted language from our *Stone* decision, this is *not* the general rule that applies to cases involving claims of accomplice liability.

The underlying problem in *Stone* was not that the State argued in the alternative that Stone could be convicted based on his own personal conduct or based on his vicarious responsibility for Collins's conduct. Rather, the underlying problem was that the State's case was based on two separate incidents, only one of which could constitute the crime of harassment (because, under the evidence presented at trial, the victim was struck by the basketball in only one of these incidents).

True, these incidents occurred only thirty minutes apart. But, legally speaking, Stone's case presented the same problem as if Collins's later act of throwing a basketball at the victim had occurred the next day, or the next week.

■ Under Alaska law, jurors need not be unanimous as to whether the defendant is responsible for a crime by virtue of the defendant's own conduct or by virtue of other people's conduct for which the defendant is accountable under AS 11.16.110. *See McDonald* and *Totemoff,* discussed above. But when a defendant is charged with a single crime based on two or more legally separate acts, Alaska law requires that the jurors be unanimous regarding which act forms the basis of the defendant's conviction. As we said in *Totemoff:*

> [W]hen two or more discrete acts, each potentially amounting to a crime, are encompassed in a single charge, the jury must be unanimous in deciding the act upon which it determines [the defendant's] guilt.

*Totemoff,* 866 P.2d at 129.

See *State v. James,* 698 P.2d 1161 (Alaska 1985), where the supreme court addressed situations in which the jury need not be unanimous concerning the precise theory of the defendant's guilt. The supreme court explained that the law permits this non-unanimity only in situations where "only one criminal act [is] alleged and only one incident

[is] involved". *Id.* at 1165–66. *See also Nunn v. State*, 845 P.2d 435, 443–44 (Alaska App.1993); *Covington v. State*, 703 P.2d 436, 440–41 (Alaska App.1985), *as modified in* 711 P.2d 1183, 1184–85 (Alaska App.1985).

Thus, the real problem in *Stone* was that the jurors were instructed that they could convict Stone of harassment based on either of two separate acts, but the State's evidence was legally insufficient to prove that Stone was guilty of the second of these acts.

In Stone's particular case, the flaw in the State's case with respect to the second incident was that there was no evidence that Stone, when he committed the earlier act of throwing a basketball at the victim, had performed this act with the intent of inciting or encouraging a later, similar assault by his co-worker, Collins. But the outcome of Stone's appeal would have been the same if the State's evidence relating to this second incident had been legally insufficient for any other reason.

To explain this point slightly differently: With respect to either one of the two incidents of basketball-throwing, the State would have been allowed to argue for Stone's conviction based on (1) Stone's own personal conduct, or (2) the conduct of Collins, if Stone was accountable for that conduct under AS 11.16.110, or (3) both. Moreover, with respect to each of these two incidents (considered separately), the jurors did not need to be unanimous as to whether Stone's responsibility for that incident was based on his own conduct, or Collins's conduct, or both. But the jurors *were* required to reach unanimous agreement as to whether Stone was being convicted of harassment based on the first incident or the second.

As it happened, the sole theory to support Stone's conviction for the first incident was based on evidence of Stone's own personal conduct, while the sole theory to support Stone's conviction for the second incident was based on the (legally insufficient) evidence that he should be held vicariously accountable for Collins's conduct under AS 11.16.110(2). Because of this happenstance, this Court described our decision in Stone's case as resting on the insufficiency of the evidence to support a finding of vicarious liability under AS 11.16.110(2):

> Both theories [that is, culpability based on Stone's own conduct, and culpability based on Stone's responsibility for Collins's conduct] went to the jury. We have determined that [this latter] theory ... was [not] supported by [sufficient] evidence. [Because the] jury returned a general verdict[,] it is impossible ... to determine which theory resulted in Stone's conviction.

*Stone*, 1987 WL 1359302 at \*3.

This is all true, as far as it goes. But, for purposes of describing the legal reason why this Court reversed Stone's conviction, it is misleading.

The real problem in Stone's case was that both *acts* were submitted to the jury as separate potential bases for finding Stone guilty of harassment, and there was insufficient evidence to support a finding that Stone was criminally responsible for the second act. Because Alaska law requires a jury to be unanimous regarding the *act* that forms the basis for a defendant's conviction, and because it was impossible to tell whether Stone's jury had convicted him based on the first act or the second act, this Court was obliged to reverse Stone's conviction.

In other words, our decision in *Stone* should not be read as endorsing the proposition advanced by Andrew—the proposition that, when a defendant is potentially guilty of a criminal offense based on the defendant's own conduct or, alternatively, based on the defendant's vicarious responsibility for other people's conduct, and when the jury returns a general verdict that does not specify the precise basis of the defendant's culpability, the State's evidence must be sufficient to independently establish the defendant's guilt under *both* theories of responsibility.

In fact, Alaska law follows a contrary rule. Under AS 11.16.100, the question is whether the defendant's guilt is established by the *combination* of the defendant's personal conduct and the conduct of other people for which the defendant is vicariously accountable under AS 11.16.110.

*Why we conclude that the evidence was sufficient to establish Andrew's criminal liability for receiving or concealing the property stolen in the earlier burglaries and thefts*

■ Andrew was convicted of receiving or concealing many items of property that had been stolen during burglaries and thefts that occurred in the days prior to the burglary and theft at the Jackson residence. This stolen property was recovered from Chris Parker's house; it was contained in bags that had been transferred—with Andrew's assistance—from Haws's Mercury to Parker's Jeep (at the Jackson residence), and then from Parker's Jeep into Parker's house. Haws and Andrew left these bags sitting outside the bedroom in which they barricaded themselves when the troopers arrived at Parker's house to investigate the burglary and theft at the Jackson residence.

The crime of theft by receiving is defined in AS 11.46.190(a) as "buy[ing], receiv[ing], retain[ing], conceal[ing], or dispos[ing] of stolen property with reckless disregard that the property was stolen." Subsection (b) of this statute declares, in pertinent part, that "receiv[ing]" includes "acquiring possession [or] control".

The evidence presented at Andrew's trial reasonably supported the conclusion that, in the days prior to the burglary at the Jackson residence, Andrew had been accompanying Haws while Haws accumulated stolen credit cards and goods—and that Andrew knew what Haws was doing, and was personally profiting from Haws's criminal activities.

As we noted in the section of our opinion describing the evidence, one of the bags ultimately recovered from Chris Parker's house apparently belonged to, or was being used by, Andrew: this bag contained women's underwear and feminine hair, skin, and hygiene products, as well as photographs of Haws and Andrew. The bag also contained jewelry that was stolen in an earlier burglary.

Moreover, this same bag contained stationery from the Marriott Residence Inn— where, just a few days earlier, someone had rented a room using a woman's stolen credit card. The troopers found this same stolen

credit card lying next to Andrew when the troopers entered the bedroom at Chris Parker's house and arrested her. And it was reasonable for the jurors to infer that Andrew, rather than Haws, was the one who presented this credit card to the staff of the Marriott in payment for the room—because the name on the credit card was a woman's.

Thus, the evidence reasonably supported the conclusions that Andrew knew that the property was stolen, that she had appropriated or received some of this stolen property for her own use, and that she helped transfer this stolen property from Haws's immobilized Mercury (at the Jackson residence) to a storage place of apparent safety at Chris Parker's house.

In addition, as we explain in the next section of this opinion, the circumstances of Andrew's relationship with Haws, coupled with the fact that she accompanied Haws while he accumulated the stolen property and that she shared the benefits of that stolen property, were sufficient to constitute an incitement or encouragement of Haws's criminal conduct, thus rendering Andrew vicariously liable for that conduct as an abettor.

For these reasons, we conclude that the evidence was sufficient to support Andrew's conviction of theft by receiving.

*Why we conclude that the evidence was sufficient to establish Andrew's criminal liability for the burglary of Jackson's house and the accompanying theft of Jackson's property*

■ Under AS 11.16.100, Andrew could be found guilty of the burglary of the Jackson residence and the accompanying theft of property from that residence based on (1) her own conduct, or based on (2) Brian Haws's conduct if, under the rules for vicarious liability set forth in AS 11.16.110(2), Andrew could be held accountable for that conduct, or based on (3) a combination of her own conduct and Haws's conduct.

Given the evidence in this case, it is obvious that Andrew's personal conduct, standing alone, was not sufficient to constitute a burglary of Jackson's house. Even viewing the evidence in the light most favorable to the

jury's verdict on this count of the indictment, there was no evidence that Andrew entered Jackson's residence. Thus, if the State's proof was sufficient to convict Andrew of this burglary, it must be under the theory that Andrew was legally accountable for Haws's entry into the house.

To hold Andrew accountable for Haws's conduct in burglarizing the Jackson residence, the State had to prove either that Andrew solicited Haws to commit this offense, or that she aided or abetted (*i.e.,* encouraged) Haws in planning or committing the offense, and that she did so with the intent to promote or facilitate the commission of the offense. *See* AS 11.16.110(2).

Andrew argues that the State failed to prove that she knew about Haws's plan to burglarize the residence, much less that she intended to promote or facilitate the burglary. She contends that the State did not present any direct evidence that she either asked or counseled Haws to commit these crimes, or that she provided aid or encouragement to him in the planning or commission of these crimes.

But, viewing the evidence in the light most favorable to upholding the verdict, there is a great deal of circumstantial evidence supporting the inferences that (1) Andrew knew that Haws intended to burglarize the residence and that (2) Andrew abetted the burglary by accompanying Haws so that she could provide any help he might need in breaking into the residence and making off with the stolen goods.

As we have already discussed, the evidence presented at Andrew's trial reasonably supported the conclusions (1) that, prior to the burglary at the Jackson residence, Andrew had been accompanying Haws for several days while Haws accumulated stolen credit cards and goods, (2) that Andrew knew what Haws was doing, and (3) that Andrew was personally profiting from Haws's criminal activities. We note, in particular, the fact that one of the bags recovered from Chris Parker's residence apparently belonged to (or was being used by) Andrew, and that this bag contained jewelry stolen in a previous burglary. We further note that a woman's stolen credit card was found near Andrew when she was arrested, and the circumstances supported the inference that Andrew had used this stolen credit card to pay room charges at the Marriott Residence Inn.

This evidence tended to show that Andrew knew what Haws planned to do when they drove to the Jackson residence, and that she approved of Haws's plan and was willing to help or encourage Haws in this criminal endeavor.

The testimony of Richard Miller and his son provided further circumstantial evidence that Andrew knew what Haws planned to do at the Jackson residence. When Miller and his son drove up the driveway to the residence, they saw Haws's white Mercury Cougar parked off the driveway. The engine was running (exhaust was visible), but neither Miller nor his son could see anyone sitting in the car; the vehicle appeared to be unoccupied. In fact, Andrew was in the car. After Haws emerged from the residence and began talking to Miller and his son, Andrew sat up in the passenger seat, so that she was now visible to the Millers. Given this testimony, the jurors could reasonably conclude that Andrew ducked down when she saw Miller and his son coming up the driveway— and that Andrew did this because she was there to help Haws burglarize the residence.

Andrew argues that, even if she accompanied Haws to the residence knowing that he intended to commit a burglary, there was no proof that she ever performed any act to assist Haws in committing the burglary. Andrew acknowledges that she helped Haws transfer the stolen goods from the disabled Mercury Cougar into Chris Parker's Jeep, and then later helped transfer the goods from the Jeep into Parker's house. But Andrew argues that these acts were insufficient (as a matter of law) to establish her complicity in the burglary.

Andrew's argument on this point is that, by the time she helped Haws transport the stolen goods away from the Jackson residence, both the burglary and the accompanying theft had already been completed: in other words, Haws had already entered the residence with the intent to commit a crime inside (burglary), and he had already taken

possession of Jackson's property with the intent to permanently deprive the owner (theft). Andrew asserts that, because these crimes had already been completed by the time she gave any assistance to Haws, she could not be held accountable as an accomplice to the burglary and the theft—that her crime, if any, was the separate offense of hindering prosecution.

(Under Alaska's former criminal code, this would have been the crime of being an "accessory"—that is, an accessory after the fact—to a felony. *See* former AS 11.10.050.)

There are two answers to Andrew's argument.

First, Andrew takes too narrow a view of what conduct on her part could support a finding of complicity (*i.e.*, a finding that she was vicariously liable for Haws's conduct).

Under Alaska law, Andrew could be held accountable for Haws's burglary of the Jackson residence even if Andrew never physically assisted Haws in breaking into the house. AS 11.16.110(2) states that a defendant can be held accountable for another person's conduct if, with the intent to promote or facilitate the criminal conduct, the defendant *either* "aids" the other person's commission of the offense *or* "abets" (that is, encourages) the other person's commission of the offense.

The term "abet" is not defined in Title 11. The drafters of AS 11.16.110 indicated, in their Commentary, that they intended this term to be understood in its common-law sense, as exemplified by prior Alaska Supreme Court cases on this subject.[20] See, for instance, *Hallback v. State,* 361 P.2d 336 (Alaska 1961), where our supreme court declared that the words "aid" and "abet", as used in the then-current statute, ACLA 1949, § 65-3-2, "refer[red] to conduct calculated to incite, encourage[,] or assist in the perpetration of a crime". *Id.* at 337. See also AS

01.10.010: "So much of the common law [as is] not inconsistent with the Constitution of the State of Alaska or the Constitution of the United States or with any law passed by the legislature of the State of Alaska is the rule of decision in this state."

At common law, the act of "abetting" encompasses conduct such as counseling or encouraging the other person's criminal act by words or gestures—or, indeed (in the words of *Perkins and Boyce*), by "any conduct which unmistakably [communicates] a design to encourage, incite, or approve of the crime".[21] Thus, "abetting" can take the form of promising a benefit if the other person will commit the crime, or threatening to inflict harm or exact a penalty if the other person declines to commit the crime.[22]

But, as noted in *Perkins and Boyce,* "much less will meet the legal requirement [of abetting]"—as, for example, "where [the defendant, as] a bystander[,] merely embolden[s] the perpetrator to [commit the crime]",[23] or where the defendant "merely stand[s] by for the purpose of giving aid to the perpetrator if necessary, provided the latter is aware of [the defendant's] purpose." [24]

(This same point is also discussed in Wayne R. LaFave, *Substantive Criminal Law* (2nd ed. 2003), § 13.2(a), Vol. 2, pp. 338–39.)

■ The evidence reasonably supported the conclusion that Andrew abetted—that is, encouraged—Haws's commission of the burglary and theft at the Jackson residence. It is true that the State presented no evidence that Andrew expressly urged or incited Haws to commit these crimes. But although accomplice liability requires proof of something more than mere presence at the scene of the crime, or mere acquiescence in the crime, it does not necessarily require proof of

**20.** Alaska Criminal Code Revision, Tentative Draft, Part 2, pp. 31–32, citing *Beavers v. State,* 492 P.2d 88, 97 (Alaska 1971); *Taylor v. State,* 391 P.2d 950 (Alaska 1964); *Daniels v. State,* 383 P.2d 323, 324 (Alaska 1963); and *Mahle v. State,* 371 P.2d 21, 25 (Alaska 1962).

**21.** Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* (3rd edition 1982), p. 739 (internal quotations and citation omitted).

**22.** *Ibid.*

**23.** *Ibid.*

**24.** *Id.* at 740.

an overt act of incitement or encouragement. Rather, an accomplice's acts of encouragement can take subtler forms.

This point of law was discussed by the Kansas Supreme Court in *State v. Ly*, 277 Kan. 386, 85 P.3d 1200 (2004), and by the Maine Supreme Court in *State v. Doody*, 434 A.2d 523 (Me.1981), and *State v. Gervais*, 394 A.2d 1183 (Me.1978).

In *Ly*, the Kansas court explained that, even though "[t]he mere presence of the defendant at the time and place of the crime is insufficient for establishing the defendant's guilt [of] that crime", there may be "facts and circumstances surrounding the defendant's presence and the defendant's conduct [at the scene]" which support a reasonable inference "that the defendant's presence did in fact encourage someone else to commit the crime"—and that, if the defendant had the intent to promote or facilitate the crime, "guilt may be inferred". *Id.* at 1207.

Thus, "[even if] the defendant's conduct does not [openly] demonstrate a design to encourage, incite, aid, abet, or assist in the crime, the factfinder may [nevertheless] consider the defendant's failure to oppose the commission of the crime, along with other circumstances, and conclude that the defendant assented to, approved of, or encouraged the commission of the crime"—thereby establishing the defendant's vicarious liability for the crime as an abettor. *Ibid.*

For example, in *State v. Doody*, 434 A.2d at 530, the Maine Supreme Court found that a wife could be convicted as the abettor of her husband's crime—the murder of the wife's mother—when the evidence showed that the wife told her husband that she "would not give him any problem" if he proceeded with the planned killing. In light of the wife's relationship to the perpetrator and to the intended victim, the Maine court concluded that the wife's conduct (in making this statement to her husband) was more than mere passive acquiescence. *Ibid.*

Similarly, in *State v. Gervais*, the defendant was a passenger in an automobile during and after a residential burglary committed by his friend, who was driving the car. 394 A.2d at 1184–85. Although Gervais was free to separate himself from the perpetrator of the burglary, he continued to ride with him after the crime. *Id.* at 1185–86. The Maine court concluded that even though Gervais "may not have ... engage[d] in any overt act of assistance, his presence as a friend could be taken as a circumstance suggesting encouragement" of his accomplice's crime. *Ibid.*

In the present case, the evidence suggested that Haws viewed Andrew as a trustworthy companion who would aid him in his unlawful activities, or who at least would assist him in hiding these illegal activities. This inference is supported by the fact that Haws handed his drug pipe to Andrew before he opened the door of Chris Parker's Jeep to challenge the troopers' arrest of Parker. It is also supported by the evidence that Andrew was aware of Haws's ongoing criminal activities, and that she was personally profiting from those criminal activities—as illustrated by the stolen jewelry found in her bag, and by the reasonable inference that Andrew was the one who used the woman's stolen credit card at the Marriott.

It was therefore reasonable for the jury to infer that Andrew accompanied Haws to the Jackson residence with the intention of promoting or facilitating the commission of another burglary and theft, and for the purpose of standing by to provide Haws with aid if he needed it—and that Haws was aware of Andrew's intention (thus drawing encouragement from her presence). This conduct would be "abetting" within the meaning of AS 11.16.110(2), and thus Andrew would be legally accountable for the ensuing burglary of Jackson's residence and the resulting theft of Jackson's property.

There is also another answer to Andrew's contention that the evidence was insufficient to establish her complicity in the burglary and theft. Even if Andrew had been unaware, when she and Haws arrived at the Jackson residence, that Haws intended to commit burglary and theft, the fact remains that Andrew watched Haws remove property from the Jackson residence, and she later actively assisted Haws in transferring this stolen property from Haws's car (which was immobilized) to Chris Parker's Jeep, so that

the stolen property could be carried away from the residence.

The testimony of Richard Miller and his son also supports the conclusion that Andrew made efforts to "clean out" Haws's Mercury Cougar by removing documents and other personal items from the glove compartment after Miller and his son discovered Haws and Andrew at the Jackson residence.

As we explained earlier, Miller and his son testified that when they came up the driveway toward the Jackson residence, they saw Haws's Cougar, and they could see exhaust coming from the car, but they could not see anyone sitting in the car; it appeared to be unoccupied. Then, after Haws appeared and the Millers began to talk to him, Andrew—who had been in the Cougar all along—sat up in the passenger seat, so that she was now visible to the Millers. Benjamin Miller testified that he saw Andrew "putting some things in a bag". Later, when the troopers searched Haws's car, they found that the glove box was empty.

Andrew contends that even if she performed these acts of assistance (transferring the stolen goods from the Cougar, and/or cleaning out identifying documents and property from the Cougar), these acts could not, as a legal matter, constitute "aiding" or "abetting" of the burglary and theft because those crimes had already been completed by the time Andrew began to assist Haws. This contention is not correct.

It is true that, for purposes of determining whether Haws committed a completed burglary and a completed theft (as opposed to an attempted burglary and an attempted theft), the burglary of Jackson's residence was complete when Haws entered the residence with the intent to steal, and the theft of Jackson's property was complete when Haws took physical possession of the property with the intent to deprive the owner or to appropriate the property to himself or any third person.[25] But there is a different test for determining when a crime is "completed" if the question is whether a person should be held accountable for that crime as an aider or an abettor.

This distinction, and the reason for having two different tests, is illustrated by crimes such as robbery, rape, or the looting of a store. The main perpetrator may have committed all the acts required to constitute the completed crime of robbery, rape, or looting (as opposed to an attempt), but the perpetration of the crime may yet be continuing—and, thus, a bystander who takes action to assist or encourage the perpetrator in the continuation of the offense becomes an accomplice to the offense.

At common law, it was important to resolve the question of when a crime was "completed" for purposes of assessing accomplice liability because, oftentimes, the resolution of this issue would determine whether a defendant who provided aid or encouragement to the main perpetrator of the crime would be deemed a principal in the second degree or, instead, an accessory after the fact (with lesser penalties).

As explained in *Perkins and Boyce*, a defendant could be held accountable as a principal in the second degree for a felony committed by another person in the defendant's presence, even when there was no pre-arrangement or prior understanding between the two, if the defendant (upon observing the other person's criminal conduct) took action to assist or encourage the other person.[26] But this would be true only if, in the eyes of the law, the felony was still in progress. If the felony was over, then the defendant's act of assistance would only make the defendant liable as an accessory after the fact.

Take, for instance, the common-law crimes of larceny and robbery, both of which required proof that the stolen property was "asported"—that is, carried away from its rightful possessor.[27] At common law, "the slightest start of the carrying-away movement" was sufficient to satisfy the require-

---

25. *See* AS 11.46.310(a) (the definition of burglary) and AS 11.46.100 (the definition of theft).

26. Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* (3rd edition 1982), p. 742.

27. *Id.,* pp. 292 (definition of larceny) and 343 (definition of robbery).

ment of asportation.[28] Thus, the crimes of larceny or robbery might be completed in an instant. *Perkins and Boyce* gives the following example: "[A] rogue who snatched a girl's earring was held to have committed larceny although the ring had been moved only a few inches [before] it [was] caught in her hair and was jerked from [the thief's] fingers." [29]

What, then, of a defendant who sees a larceny or robbery occurring and, without pre-arrangement or prior understanding, decides to aid the thief or the robber by tripping his pursuers or otherwise impeding their progress, or by showing the culprit a safe place to hide until the immediate pursuit is over, or by helping him to successfully make off with the stolen goods?

In cases where a defendant provided this type of assistance to the culprit, the offense was certainly "completed"—for purposes of charging, trying, and punishing the culprit—by the time the defendant aided the culprit. But should the defendant nevertheless be held accountable as an accomplice to the larceny or robbery (technically, a principal in the second degree) because of the assistance the defendant rendered to the culprit?

At common law, the answer was yes: the defendant's assistance to the fleeing thief or robber made the defendant accountable as a principal to the crime. The offenses of larceny and robbery were deemed to continue—for purposes of assessing accomplice liability—until the thief or robber reached a place of temporary safety, *see People v. Lawrence*, 24 Cal.4th 219, 99 Cal.Rptr.2d 570, 6 P.3d 228, 241–42 (2000), or until the thief or robber was able "[to place the stolen property] somewhere so as not to be found upon him, where it [would] be securely hidden, and where he [could] afterwards get it and appropriate it to himself". *United States v. Barlow*, 470 F.2d 1245, 1253 (D.C.Cir.1972).

The Alaska Supreme Court applied this doctrine in *Mahle v. State*, 371 P.2d 21 (Alaska 1962). In that case, a man named Ahern was present when Mahle and two other men finalized their plans to burglarize a local department store. Ahern refused to participate in the burglary, but he was still at the house when Mahle and his two confederates returned with an unopened safe that they had stolen from the store. Ahern assisted the men in prying open the safe and disposing of its contents. *Id.* at 25. The supreme court held that Ahern's actions made him an accomplice to the theft of the safe and its contents—because Ahern assisted in "the final asportation and disposition of [the stolen] property". *Ibid.*

The California Supreme Court applied this doctrine to a robbery prosecution in *People v. Cooper*, 53 Cal.3d 1158, 282 Cal.Rptr. 450, 811 P.2d 742 (1991). The defendant in *Cooper* was convicted of robbery based on his role as the driver of the get-away car. *Id.* at 745. Cooper contended that he was improperly convicted as an accomplice to the robbery, and that he should only have been convicted as an accessory after the fact, because he was unaware of his companions' intention to commit the robbery until after the robbery was over—specifically, after his companions ran back to his car with the stolen wallet (at which point, they jumped into Cooper's car, and he hurriedly drove off). *Ibid.*

The California court acknowledged that, for purposes of assessing whether the culprits were guilty of a completed robbery as opposed to an attempt, the common-law requirement of asportation was satisfied when there was any slight movement of the property away from the possession of the victim. *Id.* at 747–48. However, the California court ruled that, for purposes of assessing accomplice liability, "the commission of the crime of robbery is not confined to a fixed place or a limited period of time"; rather, the robbery "continues so long as the stolen property is being carried away to a place of temporary safety". *Id.* at 751.

*See also United States v. Willis*, 559 F.2d 443, 444 (5th Cir.1977), and *Stevenson v. United States*, 522 A.2d 1280, 1282–83 (D.C.App.1987) (both also holding that a defendant who, without foreknowledge of a robbery, voluntarily drove the robber away from the scene of the crime was punishable as a

---

**28.** *Id.,* p. 323.

**29.** *Ibid.*

principal rather than an accessory after the fact).

In *People v. Montoya,* 7 Cal.4th 1027, 31 Cal.Rptr.2d 128, 874 P.2d 903 (1994), the California Supreme Court applied this doctrine to the crime of burglary. The California court acknowledged that the crime of burglary is complete as soon as the culprit enters the building with intent to commit a crime (even though this intended crime might never be accomplished). *Id.* at 911. Nevertheless, the California court concluded that, for purposes of assessing accomplice liability, a burglary continues as long as the culprit is inside the structure. Thus, in cases where the defendant had no foreknowledge of the burglary, but decided to aid the burglar after the initial entry was accomplished, the defendant could be held accountable as an accomplice to the burglary (and not just an accessory after the fact) if the aid or encouragement was given during the original burglar's presence in the structure. *Id.* at 911–14.

The California court then turned to the related question of accomplice liability in cases where the original burglar enters and leaves the building several times during the course of a single episode of burglary. The court concluded that, for purposes of assessing accomplice liability, the burglary continues "[until] the perpetrator's final departure from the structure". *Id.* at 914.

> The individual who happens on the scene after the initial entry, becomes aware of the perpetrator's unlawful purpose, and intentionally assists during ... subsequent entries, aids and encourages the commission of the offense as surely as if that individual's knowledge [of the crime] had preceded the perpetrator's initial entry.

*Montoya,* 31 Cal.Rptr.2d 128, 874 P.2d at 914.[30]

*See also State v. Cummings,* unpublished, 1992 WL 82783 (Ohio App.1992). In *Cummings,* the defendant's husband and some other men burglarized a plumbing store, but they discovered that they needed an acetylene torch to break into the safe. The defendant's husband left the store to telephone the defendant and ask her to bring a torch. *Id.* at *7. The defendant brought the torch to her husband, as requested, and the burglary continued. *Ibid.* On appeal, the defendant contended that this evidence was insufficient to establish her complicity in the burglary, but the Ohio court held that the burglary continued until the burglars left the store for the final time—and, thus, the defendant's act of assisting and encouraging the burglars made her liable as an accomplice. *Id.* at *8.

Turning to the evidence in the present case, and viewing that evidence in the light most favorable to the verdicts, Andrew's act of cleaning out the identifying items from Haws's Cougar took place before Haws's final entry into, and departure from, the Jackson residence. Benjamin Miller testified that he saw Andrew sitting in the car, stuffing things into a bag, while he and his father were talking to Haws outside the residence—and then the Millers and Haws went back into the residence. Thus, the burglary was not yet over when Andrew engaged in her act of assistance.

And, with respect to the theft of Jackson's property, that theft continued until the stolen property was transported to Chris Parker's house—a place of temporary safety. The theft was not yet over when Andrew helped transfer this property from Haws's Cougar into Parker's Jeep, and then from Parker's Jeep into Parker's house.

For all of these reasons, the evidence was sufficient to establish Andrew's guilt of burglary and theft—more specifically, to establish that she was vicariously accountable for the burglary and the theft at the Jackson residence, based on her acts of aiding or abetting the commission of these crimes (as opposed to her potential guilt of the separate crime of hindering prosecution for rendering assistance after these crimes were completed).

*Why we conclude that the evidence was not sufficient to support a finding that the property stolen from the Jackson residence was worth $500 or more—thus requiring a reduction of Andrew's conviction from second-degree theft to third-degree theft*

■ Andrew was convicted of second-degree theft for the theft of property from the

---

**30.** Quoting *People v. Escobar,* 7 Cal.App.4th   1430, 9 Cal.Rptr.2d 770, 774 (1992).

Jackson residence. Under Alaska law, the threshold property value for second-degree theft is $500. *See* AS 11.46.130(a)(1).

The property stolen from the Jackson residence consisted of a pair of walrus tusks, a bag for Jackson's barbecue grill, a collection of two-dollar bills, a computer network router, a collection of dollar and half-dollar coins, some foreign currency, a broken Gucci watch, a golden chain necklace, and a high school class ring.

Some of these items had obvious value. There were 21 two-dollar bills with a total face value of $42. The dollar and half-dollar coins also had an ascertainable face value (although no one ever clarified the exact number of coins that were stolen from the house). In the photograph of these coins, there appear to be 40 one-dollar coins and 13 half-dollar coins—for a face value of $46.50.

The value of the remaining stolen items is unclear. The barbecue bag, the computer router, and the high school ring obviously had some value, but seemingly far less than $500. As to the foreign currency, there is no evidence identifying which countries this currency was from, or what its face value was. Likewise, the State offered no evidence of the value of the gold necklace and the broken watch. It would be pure speculation to conclude that their value approached $500.

This leaves the two walrus tusks. Conceivably, these tusks were valuable enough to push the total of the stolen goods to $500 or more. But the State offered no evidence of the value of these tusks. When Jackson described the tusks, he said that they were a gift from his parents, and that he had owned them for a long time, but neither he nor any other witness offered testimony concerning their value.

The State argues that the jurors were entitled to use common sense and their own life experience in assessing the value of the tusks, and that the jurors could reasonably conclude that the value of these tusks approached or exceeded $500.

In support of this contention, the State cites *State v. Bruff,* 597 So.2d 122 (La.App. 1992). In *Bruff,* the Louisiana court upheld the defendant's conviction for the unautho-rized use of a vehicle valued at over $1,000—even though the government offered no direct evidence of the vehicle's value. *Bruff,* 597 So.2d at 122–23. The Louisiana court concluded that the jury could reasonably find that the vehicle was worth more than $1,000 based on the photographs of the car, the fact that it was only two years old, and the fact that it was in running order (as evidenced by the fact that the defendant drove it away from a used car lot). *Ibid.*

But the facts of *Bruff* differ significantly from the facts of this case. It is reasonable to assume that jurors have some experience in buying or selling motor vehicles, or that they otherwise have knowledge of the general value-range of motor vehicles from commercial advertisements and from talking to relatives and friends. Thus, in *Bruff,* the court was willing to conclude that lay jurors could reasonably find that a two-year-old car, in working order, was worth at least $1,000.

But it is not clear to us that lay jurors—even Alaska jurors—are generally conversant with the commercial value of walrus tusks. We would not be surprised to learn that, in the northern and western maritime regions of this state, many people are familiar with the value-range of walrus ivory in both its raw and carved forms. But Andrew's trial took place in Kenai. We are not willing to assume that knowledge of the value of walrus ivory is so widespread among the population of south-central Alaska that the State could prosecute this theft charge without offering evidence of the value of the tusks.

We therefore conclude that the evidence presented at Andrew's trial was insufficient to establish that the property stolen from the Jackson residence was worth $500 or more. However, because the face value of the two-dollar bills and the coins (considered just by themselves) exceeded $50, we conclude that the State's evidence was sufficient to establish third-degree theft, which requires a threshold value of only $50. *See* AS 11.46.140(a)(1). We therefore direct the superior court to amend the judgement on this count of the indictment to reflect a conviction for third-degree theft.

*Andrew's challenges to the superior court's sentencing decision*

At sentencing, Andrew proposed two mitigating factors under AS 12.55.155(d): (d)(2)—that Andrew, although an accomplice to the crimes, played only a minor role; and (d)(3)—that Andrew participated in these crimes under some degree of duress, coercion, threat, or compulsion. The superior court rejected these mitigators, and Andrew challenges the court's decisions.

■ With regard to mitigator (d)(2), the evidence certainly suggests that Brian Haws was the primary actor in these crimes, and that Andrew played a secondary role. But a "secondary" role is not necessarily equivalent to a "minor" role. The evidence showed that Andrew accompanied Haws for an extended period of time during which Haws committed burglary and theft and accumulated a large amount of stolen property. Andrew helped Haws transport this property, she personally enjoyed the benefits of at least some of this property (*i.e.*, the stolen jewelry found in her bag), and she apparently was the one who used a stolen credit card (in a woman's name) to pay for the room at the Marriott. Given this evidence, the superior court could properly find that Andrew failed to prove mitigator (d)(2).

■ With regard to mitigator (d)(3), as the superior court acknowledged, there was some evidence suggesting that Andrew's relationship with Haws was no longer tranquil by the time they arrived at Chris Parker's house, and that Andrew wanted to leave Haws and return to Anchorage. But the fact remains that Andrew had accompanied Haws for several days during his crime spree, and that she had shared in the benefits of that spree. Further, there was no evidence that Andrew resisted or even passively opposed Haws's plan to burglarize the Jackson residence. As the superior court remarked, "although there was some evidence that [Andrew] didn't want to be around Mr. Haws anymore shortly after the Jackson burglary, there was [no] evidence that [Andrew's involvement] in [these crimes was the result of] any type of threat, coercion, [or] compulsion[.]"

When we review the superior court's decision on this mitigator, we must view the evidence in the light most favorable to upholding the superior court's conclusion. Viewing the evidence in that light, the superior court could properly conclude that Andrew failed to prove mitigator (d)(3).

■ Finally, Andrew argues that her sentencing judge, Superior Court Judge Charles T. Huguelet, failed to adequately consider the sentencing criteria codified in AS 12.55.005, and that the judge abused his sentencing discretion when he failed to suspend the imposition of Andrew's sentences for her three crimes.

At the sentencing hearing, Andrew's attorney asked Judge Huguelet to grant Andrew a suspended imposition of sentence. The defense attorney argued that Andrew was relatively young (twenty-nine years old), and the attorney noted that Andrew was the mother of several children, and that she had no prior criminal history.

(Andrew was convicted of driving under the influence and leaving the scene of an accident while she was on bail release in this case, but she had no criminal history prior to her commission of the three offenses in this case.)

Judge Huguelet declined to suspend the imposition of Andrew's three sentences. Here is how he explained his decision:

> *The Court:* I thought long and hard about a suspended imposition of sentence—[although,] even with a suspended imposition of sentence, the legislature requires a year in jail ... because we have a conviction of a [class] B felony. [But] looking at her age and stage [of life]—I mean, she was in her late twenties, [and] a mother. She can't be held completely blameless for what [she] did here. She was with Mr. Haws when he [committed these crimes]. It may well not have been her idea to commit the burglaries, but she was there, she participated in it, she was caught with [the stolen property], and she hasn't accepted responsibility for what she's done. So I don't think a suspended imposition of sentence is appropriate in

her case, although she is certainly sympathetic in many respects.

Judge Huguelet's statement that Andrew had to serve at least 1 year in prison, even if she received three suspended impositions of sentence, was a reference to the provisions of AS 12.55.125(d)(1). Under this statute, because the offense of first-degree burglary is a class B felony,[31] and because Judge Huguelet found that Andrew had failed to prove either of her proposed mitigators, the judge could suspend the imposition of Andrew's sentence for this crime only if the judge required Andrew to serve at least 1 year in prison as a condition of Andrew's probation.

Judge Huguelet's statement that Andrew "ha[d]n't accepted responsibility for what she's done" was apparently a reference to the pre-sentence report. In that report, the pre-sentence investigator stated that when Andrew was asked why she committed the offenses, she replied, "I didn't do it."

It is true, as Andrew points out in her brief to this Court, that Judge Huguelet did not individually identify or discuss the statutory sentencing criteria when he articulated his reasons for refusing to grant Andrew suspended impositions of sentence for her three crimes. But the judge's explanation is clearly based on those criteria.

Judge Huguelet pointed out that Andrew, at twenty-nine years of age, and being the mother of several children, could no longer be considered young or naive. Moreover, Andrew's crimes were not the result of a spur-of-the-moment decision. Rather, Andrew accompanied Haws while he committed a series of burglaries and thefts over the course of several days. She aided and abetted him, and she shared in the proceeds. And, as Judge Huguelet noted, Andrew apparently still refused to accept responsibility for these acts; instead, she affirmatively denied that she had done anything wrong.

These facts constitute a sufficient reason for Judge Huguelet to refuse Andrew's request for a suspended imposition of sentence on all three of her offenses.

*Conclusion*

The judgement of the superior court is AFFIRMED, with the exception that Andrew's conviction on Count III of the indictment (the theft by receiving count) must be reduced to third-degree theft, and Andrew must be re-sentenced on this count.

We remand Andrew's case to the superior court for this purpose, but we do not retain jurisdiction over this case.

---

**31.** *See* AS 11.46.300(b).